# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| THE HOME DEPOT, INC. and HOME DEPOT U.S.A., INC., | ) ) ) |
| Plaintiffs, | ) ) Case No. 1:21-cv-00242 |
| v. | ) ) ) Judge _____ |
| STEADFAST INSURANCE CO.; ZURICH AMERICAN INSURANCE CO.; and GREAT AMERICAN ASSURANCE CO., | ) ) ) ) ) JURY TRIAL DEMANDED |
| Defendants. | ) ) |

## COMPLAINT

Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc. (together "Home Depot") bring this action for damages against its insurers, Defendants Steadfast Insurance Co. and Zurich American Insurance Co. (together "Steadfast") and Great American Assurance Co. ("Great American" and together with Steadfast, the "Carriers").  The Carriers have refused to honor their obligations under their commercial general liability ("CGL") and excess policies (together, the "Policies") to indemnify Home Depot for its losses that it suffered in connection with a data breach.

## NATURE OF THE ACTION

1.   This is an action to recover money due under the Policies.

2.   Home Depot purchased CGL insurance and excess liability insurance from a group of insurance carriers including Steadfast and Great American.  Under the terms of the

Policies, the Carriers agreed to indemnify Home Depot for losses due to "property damage," including "the loss of use of tangible property that is not physically injured."

3. In 2014, while the Policies were in force, Home Depot was the victim of a data breach that destroyed the security and safety of the payment cards of millions of Home Depot customers. Credit card issuers, in turn, spent millions of dollars to address the data breach, including by cancelling and reissuing plastic payment cards that could no longer be used for customers to gain exclusive access to their accounts.

4. The credit card issuers sued Home Depot for alleged negligence and sought to recover, among other things, the cost to replace the plastic payment cards. Because the credit card issuers' claims sought damages due to the loss of use of the tangible payment cards—which were not themselves physically injured— Home Depot promptly notified Steadfast and Great American and requested that the Carriers cover the cost of its defense and indemnify Home Depot for such losses.

5. Steadfast and Great American did not honor their duty to defend Home Depot and refused to indemnify Home Depot for its losses. Home Depot vigorously defended the claims on its own, and eventually reached a multi-million-dollar settlement with the card issuers. Of this settlement amount, the available information shows that the cost to replace over 36 million unusable plastic payment cards was up to $75 million and may have been well over $100 million.

6. In the summer of 2020, Home Depot renewed its request for Steadfast and Great American to indemnify it for losses it incurred due to the loss of use of the physical payment cards. The Carriers again refused to honor their obligations under the Policies.

7. Home Depot now brings this action to recover damages for the Carriers' breach of contract and any other available remedies.

## PARTIES, JURISDICTION, AND VENUE

8. Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc. are both Delaware corporations with their principal places of business in Atlanta, Georgia.

9. Defendant Steadfast Insurance Company is an Illinois corporation with its principal place of business in Illinois.

10. Defendant Zurich American Insurance Company is a corporation duly organized and existing pursuant to the laws of the State of New York with its principal place of business located in Illinois.

11. Great American Assurance Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

12. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the Plaintiffs and the Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. This Court has jurisdiction over the person of Great American Assurance Company because it is incorporated to do business in Ohio and its principal place of business is in Cincinnati, Ohio.

14. This Court has jurisdiction over the person of Steadfast Insurance Company and Zurich American Insurance Company pursuant to the terms of the policies between Steadfast and Home Depot.  Under these policies, Steadfast expressly agreed that if "an action or proceeding arises under [the Policy]," then Steadfast would "submit to the jurisdiction of a court of

3

competent jurisdiction within the United States." (Exhibit A (Steadfast Primary Policy) at 55; Exhibit B (Steadfast Excess Policy) at 13, § IV(S).)[1]

15. Venue is proper in this United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(3) because Defendant Great American resides in this district and is subject to this Court's personal jurisdiction with respect to this action.

## FACTS

### I. The Carriers issued policies to Home Depot.

16. Steadfast issued two relevant policies to Home Depot: the "Steadfast Primary Policy" (No. GLO 4887714-04) and the "Steadfast Excess Policy" (No. IPR 3757608-04) (together, the "Steadfast Policies"). True and correct copies of the Steadfast Primary Policy and the Steadfast Excess Policy are attached hereto as **Exhibits A and B**, respectively.

17. The policy period of the Steadfast Primary Policy was March 1, 2014 through March 1, 2015. The policy period of the Steadfast Excess Policy was February 1, 2013 through March 1, 2016.

18. The Steadfast Primary Policy provides broad coverage for liability claims brought against Home Depot relating to its operations. The insuring clause states:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. (Ex. A at 39, § I(A)(1)(a).)

---

[1] Unless otherwise indicated, Home Depot cites to the PDF page number of all exhibits.

19. The Steadfast Primary Policy further provides that its insurance "applies to . . . 'property damage' only if . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" (*Id.* at 39, § I(A)(1)(b)(1).)

20. Under the Steadfast Primary Policy, the term "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 53, § V(14).)

21. And the Steadfast Primary Policy defines "property damage" to include, among other things, "[l]oss of use of tangible property that is not physically injured." (*Id.* at 53-54, § V(18)).

22. The Steadfast Primary Policy has a $9 million limit, with a self-insured retention of $1 million. (*Id.* at 4, 33.)

23. The Steadfast Primary Policy also has a $9 million matching deductible.

24. Home Depot also has an additional $15 million self-insured retention ("SIR") above the first $10 million in losses.

25. Home Depot purchased layers of excess liability insurance above the Steadfast Primary Policy and $15 million SIR.

26. Steadfast issued the first layer of this excess insurance, the Steadfast Excess Policy, with a $25 million limit.

27. The Steadfast Excess Policy is generally subject to the terms and conditions of the Steadfast Primary Policy, including the Steadfast Primary Policy's insuring clause. (*See* Ex. B at 9, § IV(C).) And the Steadfast Primary Policy likewise defines "property damage" to include "loss of use of tangible property which has not been physically injured or destroyed provided

5

such loss of use is caused by an occurrence to which this insurance applies." (*Id.* at 65, § IV(N)(2).)

28. Steadfast issued the Steadfast Primary Policy and Steadfast Excess Policy to Home Depot in Atlanta, Georgia, through a broker also located in Atlanta, Georgia.

29. Great American issued the next layer of excess insurance, the Great American Umbrella Policy (No. UMB 1910640), with a coverage limit of $25 million. A true and correct copy of the Great American Umbrella Policy is attached hereto as **Exhibit C**.

30. The Great American Umbrella Policy covers the policy period from March 1, 2014 to March 1, 2015.

31. Like the Steadfast Policies, the Great American Umbrella Policy's insuring clause provides as follows:

> We will pay on behalf of the "insured" those sums in excess of the "retained limit" that the "Insured" becomes legally obligated to pay as damages, by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of . . . "bodily injury" or "property damage" that takes place . . . during the Policy Period and caused by an "occurrence" happening anywhere. (Ex. C at 43, § 1(A).)

32. The Great American Umbrella Policy defines "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at 59, § V(O).)

33. And the Great American Umbrella Policy also defines "property damage" to include "loss of use of tangible property that is not physically injured." (*Id.* at 61, § V(T).)

34. Great American issued the Umbrella Policy to Home Depot in Atlanta, Georgia, through a broker also located in Atlanta, Georgia.

6

#3175150v1

35. The following chart summarizes the applicable coverage under the Steadfast Primary, Steadfast Excess, and Great American Excess Policies:

| Policy | Layer and Limit up to $75M | Coverage |
|---|---|---|
| Great American Umbrella | $25M in excess $50M | $50 million |
| Steadfast Excess Policy | $25M in excess of $25M | |
| Self-Insured Retention | $15M Self-Insured Retention | $25 million |
| Steadfast Primary Policy | $9M limit<br>$9M matching deductible<br>$1M Self-Insured Retention | |

36. Georgia law governs Home Depot's claims in this action arising out of the Policies.

II. **Home Depot customers used plastic payment cards received from various financial institutions to make purchases at Home Depot stores from April to September 2014.**

37. Various financial institutions (the "Issuing Banks") issued plastic payment cards to their customers who, in turn, used those cards to make purchases at Home Depot from April to September, 2014.

38. Branded on these payment cards was the customers' financial account information (*e.g.*, account number, expiration date, and security code).

7

39. The ability to use these payment cards had significant value to the Issuing Banks. The payment cards were intended to allow the account holder to make secure payments—both in person at retail stores like Home Depot and online, using these cards as a reminder of the account holder's financial account information. Without a plastic payment card, the Issuing Banks' customers would not use the Issuing Banks' services as much (or at all), and thus the Issuing Banks would receive less interest and transaction fees from customers.

40. Thus, to the Issuing Banks, the value of these payment cards exceeds the cost of manufacturing, printing, and shipping them to the customers.

### III. Home Depot was the victim of a data breach during the policy period and a defendant in a class action resulting from the breach.

41. In September 2014, Home Depot learned that it was a victim of a data breach starting in April of that year, which was during the policy period of the Policies. Computer hackers had managed to infiltrate Home Depot's network and use malware to attack its systems.

42. With this malware, the hackers were able to steal payment card data and personal contact information for millions of Home Depot customers, potentially increasing the risk of fraudulent transactions on their payment card accounts.

43. When it learned of the breach, Home Depot took swift action to contain the attack and notify its customers.

44. But, as a result of the data breach, the Issuing Banks that had issued the affected credit cards incurred substantial losses and sued Home Depot to recover them.

45. Among other things, the Issuing Banks alleged that the plastic payment cards issued to their customers no longer enabled secure transactions because other parties had access

to the customers' account numbers and other identifiers physically stamped on the cards. Thus, the Issuing Banks and their customers lost the use of these plastic payment cards.

46. Because of this loss of use of these plastic payment cards, the Issuing Banks incurred costs including the cost to replace the compromised plastic payment cards as well as lost interest and transaction fees due to reduced card usage. Alternatively, the cost to replace the compromised plastic payment cards approximates the value to the Issuing Banks of the loss of use of these cards.

47. These Issuing Banks filed class action lawsuits bringing, among others, negligence claims against Home Depot, which were consolidated in the United States District Court for the Northern District of Georgia, *In re: The Home Depot, Inc. Customer Data Security Breach*, No. 14-02683-TWT (N.D. Ga.) (the "Litigation").

48. The Issuing Banks sought damages for the cost to replace the physical payment cards that they could no longer use for secure transactions.

49. The Issuing Banks did not bring a breach of contract claim against Home Depot.

**IV.     The Carriers Denied Coverage, leaving Home Depot to defend the claims on its own.**

50. Home Depot provided timely notice of the Issuing Banks' claims to Steadfast and Great American pursuant to the terms of the Policies. These claims included the Issuing Banks' claims for the costs associated with replacing physical payment cards that, although not physically injured, could not be used to ensure that customers maintained exclusive access to their account information (the "Card Replacement Claims").

51. The Card Replacement Claims fall squarely within the insuring clauses of the Steadfast and Great American Policies and are not otherwise excluded by these Policies.

52. On or about June 30, 2015, Steadfast denied coverage under its Primary Policy and Excess Policy for any claims arising out of the data breach, including the Card Replacement Claims. Steadfast reaffirmed its denial of coverage in letters dated November 17, 2016 and January 5, 2021.

53. On or about May 12, 2017, Great American denied coverage under the Umbrella Policy for any claims arising out of the data breach, including Card Replacement Claims. Great American reaffirmed its denial of coverage in a letter dated September 25, 2020.

54. The Carriers failed to honor their duty to defend Home Depot in the Litigation.

55. Home Depot vigorously defended the Issuing Banks' claims on its own behalf.

56. After nearly three years of litigation, Home Depot entered into two settlements with the Issuing Banks. First, Home Depot settled claims with many of the larger financial institutions (which covered about 80% of the compromised cards) for over $136 million. Home Depot then settled with the remaining class members for another $27.25 million.

57. Thus, without accounting for attorneys' fees and other litigation expenses, Home Depot has incurred over $163 million in losses to settle the Issuing Banks' claims.

58. Of this settlement amount, the available information shows that the cost to replace over 36 million unusable plastic payment cards was up to $75 million and may have been well over $100 million.

59. In July and August, 2020, Home Depot again demanded that the Carriers cover its damages incurred because of the loss of use of the physical payment cards, as alleged in the Issuing Banks' claims. The Carriers again denied coverage.

60. Home Depot's losses, including settlement payments, in connection with Card Replacement Claims exceed $75 million. Home Depot bore the cost of the first $25 million of this loss pursuant to the terms of the Steadfast Policies and self-insured retentions.

61. Home Depot now demands the full amount of the limits on the Steadfast Excess Policy and Great American Umbrella Policy in connection with this covered loss, in excess of $25 million.

## COUNT 1
**(Breach of Contract Against Steadfast)**

62. Home Depot restates and re-alleges the facts and allegations set forth in paragraphs 1 through 61 as if fully set forth herein.

63. The Steadfast Primary Policy and Steadfast Excess Policy are binding and enforceable contracts between Home Depot and Steadfast.

64. Home Depot has fully complied with all the terms and conditions of the Steadfast Primary Policy and Steadfast Excess Policy relating to the Card Replacement Claims and all other claims tendered to Steadfast in connection with the 2014 data breach.

65. Steadfast breached its duty to defend Home Depot in connection with the Card Replacement Claims made in the Litigation. Steadfast is liable to pay Home Depot's costs to defend and settle the Litigation.

66. Steadfast also refused to indemnify Home Depot for losses in connection with the Card Replacement Claims, which are covered under the Steadfast Policies and not otherwise excluded.

67. Steadfast's failure to defend and indemnify Home Depot constitutes a breach of the Steadfast Policies, resulting in damages to Home Depot up to the full policy limit of $25 million.

## COUNT 2
### (Breach of Contract Against Great American)

68. Home Depot restates and re-alleges the facts and allegations set forth in paragraphs 1 through 61 as if fully set forth herein.

69. The Great American Umbrella Policy is a binding and enforceable contract between Home Depot and Great American.

70. Home Depot has fully complied with all of the terms and conditions of the Great American Umbrella Policy relating to the Card Replacement Claims and all other claims tendered to Great American in connection with the 2014 data breach.

71. Great American breached its duty to defend Home Depot in connection with the Card Replacement Claims made in the Litigation.  Great American is liable to pay Home Depot's costs to defend and settle the Litigation.

72. Great American refused to indemnify Home Depot for losses in connection with the Card Replacement Claims, which are covered under the Great American Umbrella Policy and not otherwise excluded.

73. Great American's failure to defend and indemnify Home Depot constitutes a breach of the Great American Umbrella Policy, resulting in damages to Home Depot up to the full policy limit of $25 million.

## COUNT 3
### (Bad Faith and Stubborn Litigiousness, O.C.G.A. § 13-6-11)

74. Home Depot repeats and realleges each and every allegation of paragraphs 1 to 73 as if fully set forth herein.

75. The Carriers have acted in bad faith, been stubbornly litigious, and caused Home Depot unnecessary trouble and expense.

76. Home Depot is entitled to its expenses of litigation, including reasonable attorneys' fees, under O.C.G.A. § 13-6-11.

## DEMAND FOR JURY TRIAL

Home Depot respectfully requests a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc. respectfully pray for judgment as follows:

(a) The Court enter judgment in favor of Home Depot and against the Defendants in an amount to be determined at trial;

(b) The Court award Home Depot its expenses of litigation, including attorneys' fees and costs;

(c) The Court award Home Depot pre-judgment and post-judgment interest; and

(d) The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

*Signature follows on the next page.*

Dated: April 8, 2021                    Respectfully submitted,

/s/ Peter J. O'Shea
Peter J. O'Shea (0086560)
Trial Attorney for Plaintiffs
**KATZ TELLER BRANT & HILD**
255 East Fifth Street, Suite 2400
Cincinnati, OH 45202
Telephone: (513) 721-4532
Facsimile: (513) 762-0001
Email: poshea@katzteller.com

-and-

Ronan P. Doherty
Georgia Bar No. 224885
Michael R. Baumrind
Georgia Bar No. 960296
**BONDURANT, MIXSON & ELMORE, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
Email: doherty@bmelaw.com
Email: baumrind@bmelaw.com
*Motion for admission pro hac vice forthcoming*

***Attorneys for Plaintiffs The Home Depot, Inc. and Home Depot U.S.A., Inc.***

14