## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| THE HOME DEPOT, INC. and HOME DEPOT U.S.A., INC., <br><br> Plaintiffs, <br><br> v. <br><br> STEADFAST INSURANCE CO. and GREAT AMERICAN ASSURANCE CO., <br><br> Defendants. | Civil Action No. 1:21-cv-00242-SJD <br><br> District Judge Susan Dlott |

**DEFENDANT STEADFAST INSURANCE COMPANY'S RESPONSE TO PLAINTIFFS' PROPOSED UNDISPUTED FACTS AND ADDITIONAL PROPOSED UNDISPUTED FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Pursuant to this Court's Standing Order on Civil Procedures, § I(E)(2), Defendant, Steadfast Insurance Company (hereinafter "Steadfast"), provides the following response to the Proposed Undisputed Facts submitted by Plaintiffs, The Home Depot, Inc. ("THD") and Home Depot U.S.A., Inc. ("HDU") (collectively, the "Home Depot")

*The Relevant Insurance Policies*

1.     Defendant Steadfast Insurance Co. ("Steadfast") issued a primary commercial general liability ("CGL") policy, No. GLO 4887714-04, to Home Depot for the policy period March 1, 2014 to March 1, 2015 (the "Steadfast Primary Policy"). (Steadfast's Ans., Doc. 21 at 2, 5, ¶¶ 2, 16; Declaration of Matthew Ward ("Ward Decl.")), Doc. 43-1 at 2, ¶ 2; Ward Decl. Ex. A, Doc. 43-2.)

**Response:** Steadfast admits that it issued the Steadfast Primary Policy to THD. (Doc. 43-2 at PageID 626.) HDU, a subsidiary of HDI, is an insured under the Steadfast Primary Policy based upon a Broad Named Insured Endorsement contained therein. (Doc. 43-2 at PageID 637.)

2.     A true and correct copy of the Steadfast Primary Policy is attached to the Declaration of Matt Ward as Exhibit A. (Ward Decl., Doc. 43-1 at 2, ¶ 2; Ward Decl. Ex. A, Doc. 43-2.)

**Response: Admitted.**

3.     The policy period of the Steadfast Primary Policy was March 1, 2014 through March 1, 2015. (Steadfast Ans., Doc. 21 at 5, ¶ 17.)

**Response: Admitted.**

4.     Under the Steadfast Primary Policy, Home Depot was to cover the first $1 million of covered losses and, though the Steadfast Primary Policy covered the next $9 million in losses, Home Depot bore the financial responsibility for that loss under a matching deductible. (Steadfast's Ans., Doc. 21 at 6, ¶¶ 22–23; Ward Dec., Doc. 43-1 at 2-3, ¶ 3.)

**Response: Admitted.**

5.     Home Depot also had an additional $15 million self-insured retention above the first $10 million in losses, meaning that Home Depot effectively bore the first $25 million of covered losses. (Steadfast's Ans., Doc. 21 at 6, ¶ 24; Ward Decl., Doc. 43-1 at 2-3, ¶ 3.)

**Response:  Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "$10 million in losses," except admits that the $25 million in limits under the Steadfast Excess Policy applies to *covered* losses.**

6.     Home Depot also bought layers of excess liability insurance above $25 million. The first was a $25 million Steadfast Excess Policy subject to the terms and conditions of the Steadfast Primary Policy. (Steadfast's Ans., Doc. 21 at 6, ¶¶ 25-27; Ward Decl., Doc. 43-1 at 3, ¶ 4; Ward Decl. Ex. B, Doc. 43-3 at 8-9, § IV(C).)

**Response: Steadfast admits that it issued an Integrated Insurance Policy, Policy No. IPR 3757608-04, to THD, with effective dates of February 1, 2013 to March 1, 2016 (the "Steadfast Excess Policy"), which terms, conditions, exclusions and endorsements speak for themselves. (Doc. 43-3.) HDU is an insured under the Steadfast Excess Policy based upon a Broad Named Insured Endorsement contained Steadfast Primary Policy.**

7.     The policy period of the Steadfast Excess Policy was February 1, 2013 through March 1, 2016. (Steadfast Ans., Doc. 21 at 4, ¶ 17.)

**Response: Admitted.**

8.     A true and correct copy of the Steadfast Excess Policy is attached to the Declaration of Matt Ward as Exhibit B. (Ward Decl., Doc. 43-1 at 3, ¶ 4; Ward Decl. Ex. B, Doc. 43-3.)

**Response: Admitted.**

9.     Great American Assurance Co. ("Great American") issued the next layer of excess insurance, the Great American Umbrella Policy, with a limit of $25 million above $50 million in losses. (Great American's Ans., Doc. 20 at 3, ¶ 13; Ward Decl., Doc. 43-1 at 3, ¶ 5; Ward Decl. Ex. C, Doc. 43-4 ("GA Umbrella.").)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "$50 million in losses," except admits that the $25 million in limits under the GA Umbrella Policy applies to *covered* losses in excess of $50 million.**

10.    A true and correct copy of the GA Umbrella Policy is attached to the Declaration of Matt Ward as Exhibit C. (Great American Ans., Doc. 21 at 3, ¶ 13; Ward Decl., Doc. 43-1 at 3, ¶ 5; Ward Decl. Ex. C, Doc. 43-4.)

**Response**: **Admitted.**

11.    The GA Umbrella Policy covers the policy period from March 1, 2014 to March 1, 2015. (Ward Decl., Doc. 43-1 at 3, ¶ 5; Ward Decl., Doc. 43-4 at 4.)

**Response**: **Admitted.**

12.    From the Steadfast Primary Policy up through the excess layers, Home Depot's resulting coverage on these three Policies was as follows:

| Policy | Layer and Limit up to $75M |
|---|---|
| Great American Umbrella | $25M in excess of $50M |
| Steadfast Excess Policy | $25M in excess of $25M |
| Home Depot Self-Insured Retention<br><br>Steadfast Primary [Policy] | $15M Self-Insured Retention<br><br>$9M (Deductible)<br>$1M (Self-Insured Retention) |

(Steadfast Ans., Doc. 21 at 7, ¶ 35; Ward Decl., Doc. 43-1 at 3-4, ¶ 6.)

**Response**: **Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "resulting coverage," except admits that the chart accurately reflects the layers and limits of liability provided by the Steadfast Primary Policy, Steadfast Excess Policy and GA Umbrella Policy for covered losses.**

13.    Home Depot's principal place of business is in Georgia. (Great American's Ans., Doc. 20 at 3, ¶ 9; Ward Decl., Doc. 43-1 at 4, ¶ 8.)

**Response:** Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact.

14.     Home Depot negotiated the terms of the Steadfast and Great American Policies while in Georgia through its broker located in Georgia and received the executed policies at its home office in Georgia. (Steadfast Ans., Doc. 21 at 6, ¶ 28; Great American Ans., Doc. 20 at 3, ¶ 13; Ward Decl., Doc. 43-1 at 4, ¶ 9.)

**Response:** Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact as phrased, except admits that the Steadfast Primary Policy, Steadfast Excess Policy and GA Umbrella Policy were: (1) procured via Home Depot's broker, Marsh USA, Inc., which maintains an address in Georgia, and; (2) issued to Home Depot, which maintains its principal place of business in Georgia. (Doc. 43-2 at PageID 626; Doc. 43-3; and Doc. 43-4 at PageID 900.)

15.     Home Depot paid all applicable premiums in connection with the Steadfast and Great American Policies. (Ward Decl., Doc. 43-1 at 4, ¶ 7.)

**Response:**  Steadfast only admits this proposed undisputed fact as to premiums paid under the Steadfast Primary Policy and Steadfast Excess Policy. Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact as it relates to Great American Umbrella Policy.

*The Data Breach and Subsequent Litigation*

16.     In September 2014, Home Depot learned that it was a victim of a data breach that had started in April of that year. (Great American Ans., Doc. 20 at 4, ¶ 17; Steadfast's Ans., Doc. 21 at 7, ¶ 41; Ward Decl., Doc. 43-1 at 4, ¶ 10.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "victim" because the Financial Institution's Consolidated Class Action Complaint ("Consol. Complaint") filed in *In re: The Home Depot, Inc. Customer Data Breach Litigation*, No. 14-02583-TWT (N.D. Ga.) (hereinafter, the "Financial Institutions' Class Action" or "FICA") alleges, among other things, that Home Depot's treatment of sensitive personal and financial information had been "woefully inadequate for years" (Consol. Complaint, Doc. 43-19 at PageID 1474, ¶ 95), and that Home Depot had ignored repeated warnings about vulnerabilities in its computer system prior to being notified of the data breach in September 2014 (Consol. Complaint, Doc. 43-19 at PageID 1477, ¶ 102). However, Steadfast admits that, on September 2, 2014, Home Depot received reports from its banking partners and law enforcement authorities that indicated there had been unauthorized access to Home Depot's payment data systems, which has started in April 2014.**

17.    Home Depot did not expect the 2014 data breach. (Ward Decl., Doc. 43-1 at 4, ¶ 11.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "expect" because as noted above, the Consolidated Complaint alleged Home Depot had received repeated warnings about vulnerabilities in its computer system prior to being notified of the data breach in September 2014 (Consol. Complaint, Doc. 43-19 at PageID 1477, ¶ 102) and that Home Depot's IT management took affirmative steps to prevent IT staff from fixing certain vulnerabilities in the computer system (Consol. Complaint, Doc. 43-19 at PageID 1480, ¶ 109). However, Steadfast admits that it understands that Home Depot was not aware of the Data Breach until being notified of it on September 2, 2014.**

18.     Computer hackers infiltrated Home Depot's network and used malware to attack its systems. (Baumrind Decl. Ex. A, Doc. 43-19 at 46-47, ¶¶ 139–40, Compl., *In re: The Home Depot, Inc. Customer Data Security Breach*, No. 14-02583-TWT (N.D. Ga.) (the "Consol. Compl.").)

**Response: Admitted.**

19.     With this malware, the hackers allegedly stole payment card data and personal contact information of millions of Home Depot customers, exposing the card holders and the financial institutions that issued their cards to the risk of fraudulent transactions. (*Id.* at 46-47, ¶¶ 139–40; Great American Ans., Doc. 20 at 4, ¶ 18.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "exposing the card holders and the financial institutions ("Financial Institutions") that issued their cards to the risk of fraudulent transactions" because card holders were not necessarily exposed to the risk of fraudulent transactions. As noted in the May 20, 2022 expert report of Donald J. Good, the Financial Institutions voluntarily "decided to change impacted customer accounts and corresponding payment cards to reduce the potential risk of fraud." (Cantarutti Cert., Good Report, Doc. 59-5, PageID 2726.) However, Steadfast admits that with the malware installed on Home Depot's computer network, hackers stole payment card data and personal contact information of millions of Home Depot customers.**

20.     The affected payment cards were tangible property that was not physically injured. (Consol. Comp., Doc. 43-19 at 6, 2-3, 10, 64, ¶¶ 1, 4, 11, 187; Great American Ans., Doc. 20 at 4-5, ¶ 19 (conceding that the payment cards were "tangible objects.").)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "affected payment cards" because the payment cards at issue could continue to**

**be used during and after the data breach (Cantarutti Cert., Good Report, Doc. 59-5, PageID 2723), except admits that the payment cards at issue were tangible property that was not physically injured.**

21.    After learning the data breach had occurred, Home Depot promptly notified Steadfast and Great American of this occurrence. (Ward Decl., Doc. 43-1 at 4, ¶ 12.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "occurrence" because whether there was an "occurrence" remains a question of law to which a response cannot be made. However, Steadfast admits that Home Depot provided timely notice to Steadfast of the Data Breach.  Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact as it relates to notice provided to Great American.**

22.    Shortly after the data breach, financial institutions that had issued the affected payment cards (the "Financial Institutions") sued Home Depot in dozens of class actions, which were consolidated in an MDL proceeding in the Northern District of Georgia ("Consolidated Class Action"). (Ward Decl., Doc. 43-1 at 5, ¶ 13; Baumrind Decl. Ex. A, Doc. 43-19.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrase "affected payment cards" because the payment cards at issue could continue to be used during and after the data breach (Cantarutti Cert., Good Report, Doc. 59-5 at PageID 2723), except Steadfast admits that Financial Institutions that had issued the payment cards at issue sued Home Depot in dozens of class actions, which were consolidated in the Consolidated Class Action.**

23.    A true and correct copy of the Consolidated Class Action Complaint in the case of *In re: The Home Depot, Inc. Customer Data Breach Litigation*, No. 14-02583-TWT (N.D. Ga.) is

attached to the Declaration of Michael Baumrind as Exhibit A. (Baumrind Decl., Doc. 43-18 at 2, ¶ 2; Baumrind Decl. Ex. A., Doc. 43-19.)

**Response**: **Admitted.**

24. The Consolidated Class Action Complaint alleged that Home Depot had been negligent and breached its duty of care to the Financial Institutions. (*See, e.g.*, Consol. Compl., Doc. 43-19 at 71, ¶ 205.)

**Response**: **Admitted that the Financial Institutions asserted these allegations in the Consolidated Complaint.**

25. The Financial Institutions alleged that the data breach compromised the safety and security of their plastic payment cards such that they could no longer be used without risking "massive fraudulent transactions." (*Id.* at 63, ¶ 186.)

**Response**: **Steadfast disputes this proposed fact as phrased to the extent it is inconsistent with the allegations asserted by the Financial Institutions, which speak for themselves. Steadfast also disputes the payment cards "could no longer be used," which cards stopped working after the Financial Institutions made the decision to cancel the payment cards. (Cantarutti Cert., Good Report, Doc. 59-5 at PageID 2723 and 2726.) Home Depot also cites to no evidence in the record of its actual liability as a result of the data breach or the payment card claims.**

26. The Financial Institutions alleged that the risk of fraud resulted in "reduced card usage" and, thus, lost interest and transaction fees. (*Id.* at 64, ¶ 187.)

**Response**: **Steadfast disputes this proposed fact as phrased to the extent it is inconsistent with the allegations asserted by the Financial Institutions, which speak for themselves. Steadfast also disputes the alleged risk resulted in "reduced card usage," to**

**which Home Depot fails to cite any evidence in the record to support this allegation or that its incurred settlement resulted from any such "reduced card usage." Moreover, the payment cards continued to function during and after the data breach until the Financial Institutions made the decision to cancel the payment cards. (Cantarutti Cert., Good Report, Doc. 59-5, PageID 2723 and 2726.)**

27. The Financial Institutions alleged that "[a]s a result of the Home Depot data breach," they were "forced to cancel and reissue payment cards" because, among other things, the data breach impacted the "account numbers on the face of the cards." (*Id.*)

**Response: Steadfast disputes this proposed fact as phrased to the extent it is inconsistent with the allegations asserted by the Financial Institutions, which speak for themselves. Steadfast also disputes the Financial Institutions were "forced to cancel and reissue payment cards," because the payment cards continued to function during and after the data breach until the Financial Institutions made the decision to cancel the payment cards. (Cantarutti Cert., Good Report, Doc. 59-5 at PageID 2723 and 2726.)**

28. The Financial Institutions sued Home Depot to recover these reissuance costs and lost transaction costs due to the loss of use of the payment cards (the "Payment Card Claims"), as well as other damages. (Consol. Compl., Doc. 43-19.)

**Response: Steadfast disputes this proposed fact as phrased, particularly with regard to the phrases "transaction costs" and "loss of use" of the payment cards because they do not appear in the Financial Institutions' Consolidated Complaint. Moreover, Home Depot does not cite to any evidence in the record as to its actual incurred liability for the settlement payments made to the Financial Institutions. Steadfast admits that the Financial Institutions sought a monetary judgment to compensate them for alleged injuries sustained, including**

the costs of reissuance of payment cards, changing or closing accounts, notifying customers, investigating claims of fraud, refunding fraudulent charges, increasing fraud monitoring, as well as lost interest and transaction fees associated with reduced payment card usage. (Doc. 43-19 at PageID 1508.)

29.     The Financial Institutions sought hundreds of millions of dollars in damages for payment card reissuance. (Doc. 43-19 at 63-65, ¶¶ 186–189.)

**Response: Steadfast disputes this proposed fact, particularly with regard to the assertion that the Financial Institutions sought hundreds of millions of dollars in damages specific to payment card reissuance because that allegation does not appear in the Financial Institutions' Consolidated Complaint cited by Home Depot. The Financial Institutions' Consolidated Complaint merely cites several projections and asserts that the reissuance costs incurred by all Financial Institutions is a higher amount that will be determined during the course of litigation. (Doc. 43-19 at PageID 1508-1509, ¶¶ 189 and 191.) Moreover, Home Depot does not cite to any evidence in the record as to its actual incurred liability for the settlement payments made to the Financial Institutions.  However, Steadfast admits that the Financial Institutions generally sought damages for, among other things, payment card reissuance. (Doc. 43-19 at PageID 1508.)**

*Home Depot's Demand for Coverage and the Carriers' Denial*

30.     Home Depot provided the Defendants with timely notice of the Financial Institutions' claims. (Great American Ans., Doc. 20, ¶ 21; Ward Decl., Doc. 43-1 at 5, ¶ 13; Ward Decl. Ex. D, Doc. 43-5.)

**Response: Steadfast disputes this proposed undisputed fact as phrased because the cited example notification includes an email transmitting a Complaint filed by John Solak**

and Dennis O'Rourke, and not one of the Financial Institutions. However, Steadfast admits that Home Depot provided timely notice to Steadfast of the Data Breach.  Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact as it relates to notice provided to Great American and, therefore, defers to Great American's response.

31.     On June 30, 2015, Steadfast denied coverage, saying that these claims "do not potentially implicate coverage … under the Steadfast Policies." (Steadfast's Ans., Doc. 21 at 9, ¶ 52; Ward Decl., Doc. 43-1 at 5, ¶ 16; Ward Decl. Ex. E-1, Doc. 43-6 at 9.)

**Response: Admitted.**

32.     Great American initially declined to take a position on coverage. (Ward Decl., Doc. 43-1 at 5, ¶ 17; Ward Decl. Ex. F-1, Doc. 43-8.)

**Response: This proposed undisputed fact appears to be directed at Great American, and not Steadfast. Additionally, Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact and, therefore, defers to Great American's response.**

33.     By November 2015, Great American knew that Steadfast had denied coverage. (*See* Great American 0000039–40, Doc. 43-24 at 2.)

**Response: This proposed undisputed fact appears to be directed at Great American, and not Steadfast. Additionally, Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact and, therefore, defers to Great American's response.**

34.     Great American closed its file relating to Home Depot's demand for coverage under the GA Umbrella Policy in January 2016. (Great American 0000055–57, Doc. 42-25.)

**Response: This proposed undisputed fact appears to be directed at Great American, and not Steadfast. Additionally, Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact and, therefore, defers to Great American's response.**

35.     Steadfast made no financial contribution to Home Depot's defense under the Steadfast Primary or Steadfast Excess Policies. (Ward Decl., Doc. 43-1 at 5, ¶ 15.)

**Response: Steadfast disputes this proposed undisputed fact as phrased, except admits that it made no financial contribution to Home Depot's defense under the Steadfast Primary Policy. However, Steadfast did make financial contributions to Home Depot under the Steadfast excess cyber insurance policy, including the full policy limits available to Home Depot, as part of Home Depot's cyber tower. Zurich American Insurance Company ("ZAIC") likewise paid its full limits under an excess cyber insurance policy, which was available to Home Depot as part of Home Depot's cyber tower. (*See* Cantarutti Cert. Doc. 59-12 at PageID 3207 and Doc. 59-14 at PageID 3220.)**

36.     Great American made no financial contribution to Home Depot's defense under the GA Umbrella. (Ward Decl., Doc. 43-1 at 5, ¶ 15.)

**Response: This proposed undisputed fact appears to be directed at Great American, and not Steadfast. Additionally, Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact and, therefore, defers to Great American's response.**

37.     In May 2017, Great American formally notified Home Depot that there was "no coverage for [Home Depot] with respect to the [Consolidated Class Action] … because the Underlying Lawsuits are not potentially covered by the Great American Umbrella Policy." (Great

American Ans., Doc. 20 at 5, ¶ 24; Ward Decl., Doc. 43-1 at 5, ¶ 17; Ward Decl. Ex. F-2, Doc. 43-9 at 3, 8.)

**Response: This proposed undisputed fact appears to be directed at Great American, and not Steadfast. Additionally, Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact and, therefore, defers to Great American's response.**

*Home Depot's Settlement of the Consolidated Class Action and Renewed Demand for Coverage*

38.    Home Depot moved to dismiss all the Financial Institutions' claims on July 1, 2015 (Baumrind Decl., Doc. 43-18 at 2, ¶ 2; Baumrind Decl. Ex. B, Doc. 43-20.)

**Response: Admitted.**

39.    The court denied Home Depot's motion to dismiss. (Baumrind Decl., Doc. 43-18 at 2, ¶ 2; Baumrind Decl. Ex. C, Doc. 43-21.)

**Response: Admitted.**

40.    Home Depot settled claims with many of the larger Financial Institutions, paying over $100 million to cover about 80 percent of the compromised cards involved in the Consolidated Class Action. (Ward Decl., Doc. 43-1 at 5-6, ¶¶ 18–19; *In re Home Depot Inc.*, 931 F.3d 1065, 1073 (11th Cir. 2019).)

**Response: Steadfast disputes this proposed undisputed fact as phrased, particularly with regard to the phrase "paying over $100 million to cover about 80 percent of the compromised cards involved." Rather, the referenced settlement was reached via the "card brand recovery process" ("CBRP"), which is essentially a private dispute-resolution arrangement separate from litigation that occurred between Home Depot, the Financial Institutions, and the card brands (*e.g.*, Visa and Mastercard), based on contracts with**

merchants (like Home Depot) that outline the terms for accepting Payment Cards as payment. The CBRP settlement made with Visa, Mastercard and other larger banks accounting for about 80% of the alleged compromised Payment Cards involved Home Depot agreeing to pay these CBRP participating Financial Institutions the entire $120 million of an estimated assessment, plus a premium of about $14.5 million, in exchange for a release of their claims in the Financial Institutions' Class Action. (*In re Home Depot Inc.*, 931 F.3d 1065, 1073-1074 (11th Cir. 2019).)

41.     Under the relevant settlement agreements, the Financial Institutions released Home Depot from all liability in connection with the Consolidated Class Action. (Ward Decl.,Doc. 43-1 at 5-6, ¶¶ 18–19; *see, e.g.*, Ward Decl. Ex. G, Doc. 43-10.)

**Response**: **Admitted.**

42.     Exhibit G to the Declaration of Matthew Ward is one of the settlement agreements with the Financial Institutions. Together with substantially similar agreements that Home Depot entered into with other Financial Institutions, these settlements addressed about 80% of the compromised cards involved in the Consolidated Class Action. (Ward Decl., Doc. 43-1 at6, ¶ 19; *In re Home Depot Inc.*, 931 F.3d at 1073.)

**Response**: **Admitted.**

43.     The other settlement agreements with these Financial Institutions are similar in form and substance, and all include the same release of the Financial Institutions' claims against Home Depot in the Consolidated Class Action. (Ward Decl., Doc. 43-1 at 6, ¶ 19.) Altogether, these agreements require Home Depot to pay over $100 million as part of the settlement. (*Id.*)

**Response**: **Steadfast admits that these settlement agreements associated with the CBRP settlement made with Visa, Mastercard and other larger banks accounting for about**

**80% of the alleged compromised Payment Cards involved Home Depot agreeing to pay these CBRP participating Financial Institutions the entire $120 million of an estimated assessment, plus a premium of about $14.5 million. (*In re Home Depot Inc.*, 931 F.3d 1065, 1073-1074 (11th Cir. 2019).)**

44.    Home Depot agreed to pay another $27 million to resolve all the remaining class claims, plus reasonable attorneys' fees to be determined by the Court. (Baumrind Decl. Ex. D, Doc. 43-22 at 4–6.)

**Response: Steadfast disputes this proposed fact as phrased because the referenced Final Order and Judgment states that Home Depot agreed to pay: $25 million for reimbursement of the costs to replace the Payment Cards[1] placed into a non-reversionary fund to the Financial Institutions which had not released their claims against Home Depot in the FICA; and $2.25M to compensate entities whose claims had been released after they received misleading and coercive communications. (Doc. 43-22 at PageID 1650-1652.)**

45.    The court in the Consolidated Class Action approved the second settlement. (Baumrind Decl., Doc. 43-18 at 2, ¶ 2; Baumrind Decl. Ex. D, Doc. 43-22.)

**Response: Admitted.**

46.    Home Depot paid in full under the settlement agreements with the Financial Institutions. (Ward Decl., Ex. 43-1 at 6, ¶ 21.)

**Response: Steadfast lacks knowledge or information sufficient to either admit or deny this proposed undisputed fact. Pursuant to the Court's August 25, 2021 Order, discovery was bifurcated into two phases: (1) the first phase limited to fact and expert discovery related to**

---

[1] Pursuant to the Settlement Agreement, Financial Institutions that file a valid claim were to receive a "fixed payment award estimated to be $2.00 per compromised Payment Card without having to provide their losses and regardless of the amount of compensation they already have received from another source.

**liability (except as to Plaintiffs' bad faith claim) and whether the Plaintiff suffered a covered loss under the insurance policies; and (2) the second phase, if needed, related to fact and expert discovery relating to bad faith liability and the amount of damages covered under the insurance policies. (Doc. 30 at PageID 460.) The second phase has not yet commenced.**

47.    Home Depot contested the amount of the court-awarded attorney's fees, appealing that award twice. *See Ne. Engineers Fed. Credit Union v. Home Depot*, *Inc.*, No. 20-10667, 2022 WL 40210, at *1 (11th Cir. Jan. 5, 2022); *In re Home Depot Inc.*, 931 F.3d 1065, 1073 (11th Cir. 2019).

<u>**Response**</u>**: Admitted.**

48.    Home Depot prevailed on each of those appeals and significantly cut the amount of the fee award. *See Ne. Engineers Fed. Credit Union*, No. 20-10667, 2022 WL 40210; *In re Home Depot Inc.*, 931 F.3d at 1073.

<u>**Response**</u>**: Admitted.**

49.    Home Depot was ordered to pay over $12 million in fees in connection with its settlement of the claims in the Consolidated Class Action. (Baumrind Decl. Ex. E, Doc. 43-23.)

<u>**Response**</u>**: Admitted. Pursuant to the Consent Final Order on Attorneys' Fees, Expenses and Interest filed in the FICA, Home Depot was ordered to pay $11,773,932 plus interest from January 23, 2020, in addition to expenses in the amount of $710,257.86, an amount which Home Depot did not contest. (Doc. 43-23 at PageID 1664.)**

50.    In July and August 2020, Home Depot again demanded that the Carriers cover the liability that Home Depot incurred as a result of the Payment Card Claims. (Ward Decl., Doc. 43-1 at 7, ¶ 26; Ward Decl. Exs. K-1 and K-2, Docs. 43-14 and 43-15.)

<u>**Response**</u>**: Admitted.**

17

51.     The Carriers denied coverage again. (Ward Decl., Doc. 43-1 at 7, ¶ 27; Ward Decl. Exs. L-1 and L-2, Docs. 43-16 and 43-17.)

**Response**: **Admitted.**

*The Carriers Subsequent Change to Their Policies*

52.     After the 2014 data breach, Steadfast revised its primary and excess policy issued to Home Depot to exclude "damages arising out of any access to or disclosure of any person's or organization's confidential or personal information." (Ward Dec., Doc. 43-1 at 7, ¶¶ 24–25; Ward Decl. Ex. I, Doc. 43-12 at 134; Ward Decl. Ex. J, Doc. 43-13 at 35.)

**Response: Steadfast disputes this proposed fact with regard to the Steadfast Primary Policy. The quoted phrase is not part of Steadfast Primary Policy, but rather appears in a Policyholder Notice, which clearly states in the introduction: "This Notice does not form part of your policy. No coverage is provided by this Notice nor can it be construed to replace any provision of your policy." (Doc. 43-12 at PageID 134.)  Additionally, the quoted phrase is followed directly by the following sentence: "This is a reinforcement of coverage intent." (*Id.*) Finally, Steadfast admits that the Steadfast Excess Policy contains the quoted phrase, but again notes the quoted phrase is followed directly by: "This is a reinforcement of coverage intent." (Doc. 43-13 at PageID 35.)**

**STEADFAST INSURANCE COMPANY'S
ADDITIONAL PROPOSED UNDISPUTED FACTS
IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

In addition to the Proposed Undisputed Facts admitted by Steadfast above in response to Home Depot's Proposed Undisputed Facts, and pursuant to this Court's Standing Order on Civil Procedures, § I(E)(2), Steadfast provides the following additional Proposed Undisputed Facts in support of its Cross-Motion for Summary Judgment.

**I.    Home Depot's CGL Policies**

1.     In 2014, Home Depot maintained a complex insurance program procured with the assistance of its broker. (*See* Renewal Strategy Plan, Doc. 58-16 at PageID 2608-2646.)

**A.    The Steadfast Primary Policy**

2.     The Insuring Agreement of the CGL Coverage Form for the Steadfast Primary Policy provides:

> **SECTION I – COVERAGES**
>
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> **1.  Insuring Agreement**
>
> >  a.  We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.
>
> >  >  ***

(Steadfast Primary Policy, Doc 43-2 at PageID 663.)

3.     The Steadfast Primary Policy defines the terms "occurrence" and "property damage" as follows:

> **SECTION V – DEFINITIONS**
>
> >  ***
>
> 14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

***

18. "Property damage" means:

    **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Steadfast Primary Policy, Doc 43-2 at PageID 677-678.)

4.    Pursuant to the definition of "property damage" quoted above, the Steadfast Primary Policy covers "physical injury to *tangible* property" or "loss of use of *tangible* property that is not physically injured," but carves out "electronic data" from being tangible property (emphasis in italics). (*Id.*)

5.    Additionally, the Steadfast Primary Policy contains the "electronic data" exclusion ("Electronic Data Exclusion"), which provides as follows:

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

***

**2. Exclusions**

This insurance does not apply to:

***

**p. Electronic Data**

    Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

20

> As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Steadfast Primary Policy, Doc 43-2 at PageID 667.)

6.       The Electronic Data Exclusion, therefore, precludes coverage for damages "arising out of" the activities or events broadly described therein (*i.e.*, "loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data").  (*Id.*)

7.       The definition of "electronic data", whether found within the definition of "property damage" or within the Electronic Data Exclusion, includes "information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software . . ." (Steadfast Primary Policy, Doc 43-2 at PageID 667 and 678.)

**B.      The Steadfast Excess Policy**

8.       The Steadfast Excess Policy applies in "conformance with and subject to the definitions, insuring clause(s), exclusions and conditions of the Controlling Policy" (here - the Steadfast Primary Policy, including the CGL Coverage Form), unless they are inconsistent, in which case the language in the Steadfast Excess Policy shall control. (*See* Steadfast Excess Policy, Doc 43-3 at PageID 775.)

**C.      The GA Umbrella Policy**

9.       The Insuring Agreement for the Commercial Umbrella Coverage Form of the GA Umbrella Policy provides as follows:

> **I.   COVERAGE**
>
>   A.  We will pay on behalf of the "insured" those sums in excess of the "retained limit" that the "Insured" becomes legally obligated to pay as damages, by reason of liability imposed by law or assumed by the "Insured" under an "insured contract" because of

1. "bodily injury" or "property damage" that takes place; or

2. "personal injury" or "advertising injury" arising from an offense committed;

during the Policy Period and caused by an "occurrence" happening anywhere. If we are prevented by law or statute from paying such sums on behalf of the "Insured," then we will indemnify the "Insured" for them. The amount we will pay for damages is limited as described below in Section II. LIMITS OF INSURANCE.

(*See* Great American Policy, Doc 43-4 at PageID 940.)

10.     The GA Umbrella Policy provides the following relevant definitions:

### V. DEFINITIONS

F.     "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software hardware, or media, including systems and applications software hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

***

O.     "Occurrence" means :

1. as respects "bodily injury" or "property damage,' an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one "Occurrence";

***

T.     "Property damage" means :

1. physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it;

2. loss of use of tangible property that is not physically injured. All such loss will be deemed to occur at the time of the "occurrence" that caused it.

For the purpose of this insurance, "electronic data" is not tangible property.

***

(*See* Great American Policy, Doc 43-4 at PageID 952, 956 and 958.)

11.     Pursuant to the definition of "property damage" quoted above, the GA Umbrella

Policy covers "physical injury to *tangible* property" or "loss of use of *tangible* property that is not

physically injured," but expressly carves out "electronic data" as being tangible property (emphasis in italics). (*See* Great American Policy, Doc 43-4 at PageID 958.)

12.    Additionally, the GA Umbrella Policy contains the following Electronic Data exclusion:

> ### IV. EXCLUSIONS
>
> This insurance does not apply to:
>
> ***
>
> **J.  Electronic Data**
>
> "Bodily injury," "property damage/ personal injury" or "advertising injury" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data."
>
> ***

(*See* Great American Policy, Doc 43-4 at PageID 945.)

## II.    <u>Home Depot's Cyber Policies</u>

13.    In 2014, Home Depot maintained a tower of Errors & Omissions insurance policies that provided insurance coverage for cyber-related risks (the "Cyber Policies" or "Cyber Tower"). (*See* Cantarutti Cert., Home Depot's Sept. 4, 2014 Notice of Circumstances to Cyber Tower, Doc. 59-11 at PageID 3202-3204.)

14.    The primary policy for Home Depot's Cyber Tower, to which the excess layer policies generally follow form,  was a Specialty Risk Protector insurance policy, Policy No. 02-302-73-06, issued by AIG Specialty Insurance Company ("AIG"), effective February 19, 2014 to February 19, 2015 (the "AIG Cyber Policy"), with a limit of liability of $10M, and a "retention" of $7.5M. (*See* Cantarutti Cert., AIG Cyber Policy, Doc. 59-10 at PageID 3118-3119.)

15.    The AIG Cyber Policy contains five separate insuring agreements with distinct coverage sections for cyber risks associated with first and third-party losses, including the

following: (1) Cyber Extortion Coverage Section, providing coverage for privacy and security related threats associated with the unlawful use or the public disclosure of confidential information, as well as threats to attack computer systems, for the purpose of demanding money; (2) Event Management Coverage Section, includes first-party coverage related to security failure and privacy events, including conducting investigations, retaining public relations firms, notifying impacted customers, and credit monitoring associated with the same; (3) Media Content Coverage Section, which relates to third-party claims against the insured for wrongful acts in connection with media content, such as infringement of intellectual property, libel or negligent infliction of emotional distress; (4) Network Interruption Coverage Section, which provides first-party coverage for security failures of an insured's computer network, such as lost profits and costs that would not have been incurred but for the interruption to the computer network; and (5) Security and Privacy Coverage Section, which generally provides third-party coverage, including defense and indemnity, for security failure and privacy event claims made against the insured. (*See* Cantarutti Cert., AIG Cyber Policy, Doc. 59-10 at PageID 3132, 3135, 3140, 3147 and 3152.)

16.     The Cyber Tower had a total limit of $100M above the deductible/attachment or retention amount, as provided by the following:

| Insurer and Policy No. | Limit and Underlying | Layer |
|---|---|---|
| HDI's Retention | $7.5M | Retention |
| AIG Specialty Ins. Co. 02-302-73-06 | $10M | Primary |
| Zurich American Ins. Co. SPR 5948494 00 | $10M excess $10M | 1st Excess |
| Steadfast Ins. Co. IPR 375760804 | $10M excess $20M | 2nd Excess |

| Insurer and Policy No. | Limit and Underlying | Layer |
|---|---|---|
| Ironshore Specialty Ins. Co. 001930500 | $5M p/o $15M excess $30M | 3rd Excess |
| Liberty Mut. Ins. Co./Liberty Intl. Und. EONAAYID9001 | $10M p/o $15M excess $30M | 3rd Excess |
| HCC Global/Houston Casualty Co. 14-MG-14-A11857 | $10M excess of $45M | 4th Excess |
| Crum & Forster Specialty Ins. EOL-204215 | $2.5M p/o $25M excess $55M | 5th Excess |
| Homeland Ins. Co. of New York/OneBeacon NSX-0050-14 | $2.5M p/o $25M excess $55M | 5th Excess |
| QBE Specialty Ins. Co. QPL0045246 | $2.5M p/o $25M excess $55M | 5th Excess |
| Endurance American Ins. Co. MPL10004610200 | $2.5M p/o $25M excess $55M | 5th Excess |
| Scottsdale Ins. Co./Freedom XMI1401011 | $5M p/o $25M excess $55M | 5th Excess |
| General Security Indem. Co. of Arizona (SCOR) 201410F1562861 | $10M p/o $25M excess $55M | 5th Excess |
| Liberty Mutual Ins. Europe Ltd. B0509QF043714 | $10M p/o $20M excess $80M | 6th Excess |
| Lloyd's ANV Cyber Tech Consortium – ANV 1861, TAL 1183, PEM 4000, MAL5151 B0509QF043714 | $10M p/o $20M excess $80M | 6th Excess |

 (*See* Cantarutti Cert., Marsh September 29, 2014 Letter to Insurers, Doc. 59-12 at PageID 3207-

3208.)


III.    **Home Depot's Data Breach**

17.    On September 2, 2014, Home Depot received reports from its banking partners and

law enforcement authorities regarding unauthorized access to Home Depot's payment data

systems. (*See* Cantarutti Cert., Home Depot's Recitation of Joint Preliminary Report and

Discovery Plan, Doc. 59-8 at PageID 3038.)

18.     On September 8, 2014, Home Depot issued its first press release regarding the Data Breach, which explained that the "payment data systems had been breached" and that "the company has taken aggressive steps to address the malware and protect customer data." (Cantarutti Cert., September 8, 2014 Press Release, Doc. 59-2, PageID 2681; *see also* Visa GCAR Report, Doc. 58-17, PageID 2647-2670.

19.     On September 18, 2014, Home Depot issued another press release that provided more details regarding the Data Breach, which Home Depot referred to as a "cyber-attack":

**Investigation Details**

The investigation into a possible breach began on Tuesday morning, September 2, immediately after The Home Depot received reports from its banking partners and law enforcement that criminals may have breached its systems.

Since then, the company's IT security team has been working around the clock with leading IT security firms, its banking partners and the Secret Service to rapidly gather facts, resolve the problem and provide information to customers.

The company's ongoing investigation has determined the following:
-   Criminals used unique, custom-built malware to evade detection. The malware had not been seen previously in other attacks, according to Home Depot's security partners.
-   The cyber-attack is estimated to have put payment card information at risk for approximately 56 million unique payment cards.
-   The malware is believed to have been present between April and September 2014.

To protect customer data until the malware was eliminated, any terminals identified with malware were taken out of service, and the company quickly put in place other security enhancements. The hackers' method of entry has been closed off, the malware has been eliminated from the company's systems, and the company has rolled out enhanced encryption of payment data to all U.S. stores.

There is no evidence that debit PIN numbers were compromised or that the breach has impacted stores in Mexico or customers who shopped online at HomeDepot.com or HomeDepot.ca.

(Cantarutti Cert., September 18, 2014 Press Release, Doc. 59-3 at PageID 2693-2694.)

20.     On November 6, 2014, Home Depot issued its third and final press release regarding the Data Breach, which provided the following additional information regarding the investigation results and the nature of the cyber-attack:

**Additional Investigation Details Disclosed**

In addition to details previously released, the investigation to date has determined the following:

- Criminals used a third-party vendor's user name and password to enter the perimeter of Home Depot's network. These stolen credentials alone did not provide direct access to the company's point-of-sale devices.
- The hackers then acquired elevated rights that allowed them to navigate portions of Home Depot's network and to deploy unique, custom-built malware on its self-checkout systems in the U.S. and Canada.
- In addition to the previously disclosed payment card data, separate files containing approximately 53 million email addresses were also taken during the breach. These files did not contain passwords, payment card information or other sensitive personal information. The company is notifying affected customers in the U.S. and Canada. Customers should be on guard against phishing scams, which are designed to trick customers into providing personal information in response to phony emails.  Information about how to avoid phishing    and    other    email    scams    is    available    by    typing https://www.onguardonline.gov/articles/0003-phishing into your web browser.

As previously disclosed, the malware used in the attack had not been seen in any prior attacks and was designed to evade detection by antivirus software, according to Home Depot's security partners. As the company announced on September 18,the hackers' method of entry has been closed off and the malware has been eliminated from the company's systems.

The Home Depot's investigation, cooperation with law enforcement and efforts to further enhance its security measures are ongoing. The company does not anticipate further updates on the breach outside of its quarterly financial disclosures.

(Cantarutti Cert., Nov. 6, 2014 Press Release, Doc. 59-4 at PageID 2706-2707.)

21.     As a result of the Data Breach, the computer hackers were able to obtain access to "data for up to approximately 56 million unique payment cards as well as separate files containing approximately 53 million e-mail addresses." (Cantarutti Cert., Home Depot's Recitation of Joint

Preliminary Report and Discovery Plan, Doc. 59-8 at PageID 3040 *see also* Home Depot's Complaint, Doc. 1, PageID 8, at ¶ 42.)

IV.     **The Financial Institutions' Class Action (FICA)**

22.     Soon after initial reports of the Data Breach were made public, several putative class action lawsuits were filed against Home Depot. (Cantarutti Cert., Home Depot's Recitation of Joint Preliminary Report and Discovery Plan, Doc. 59-8 at PageID 3041.)

23.     As noted above, many of those putative class action lawsuits were filed by Financial Institutions who issued credit card accounts to Home Depot's customers, which were consolidated in the Financial Institutions' Class Action (or "FICA"). (Cantarutti Cert., Home Depot's Recitation of Joint Preliminary Report and Discovery Plan, Doc. 59-8, PageID 3014; Consol. Complaint, Doc. 43-19.)

24.     The Financial Institutions alleged, *inter alia*, that Home Depot failed to properly protect and safeguard payment card data and/or sensitive personal identifiable information (collectively, the "Payment Card Data") stored electronically on Home Depot's computer systems, resulting in the criminal use of the Payment Card Data. (*Id.*)

25.     The Financial Institutions further alleged that the Data Breach resulted in the criminal and illicit use of the Payment Card Data, including, but not limited to: hackers selling some of the Payment Card Data to thieves on the internet "black market"; or hackers and thieves using the Payment Card Data to engage in fraudulent transactions. (*Id.*)

26.     The Financial Institutions further alleged, *inter alia*, damages from the Data Breach as a result of: voluntarily cancelling and reissuing the payment cards; reimbursements for fraudulent transactions; lost revenues due to reduced card usage (*i.e.*, reduced transaction fees or interests); and other damages associated with the investigation of the losses and notifying

customers (the collectively, the "Payment Card Claims"). (Consol. Complaint, Doc. 43-19 at PageID 1519-1520, ¶ 214.)

27.    The pleadings filed by the Financial Institutions did not allege any physical damage to the Payment Cards as a result of the Data Breach. (Consol. Complaint, Doc. 43-19.)

28.    The pleadings filed by the Financial Plaintiffs alleged the hackers or thieves did not require possession of Payment Cards in order to illicitly extract the Payment Card Data, but rather were able to the engage in their criminal activity from the use of Payment Card Data stolen from the Home Depot payment systems.  (Consol. Complaint, Doc. 43-19 at PageID 1491, ¶¶ 140-141, and PageID 1492, ¶ 144.)

29.    The Financial Institutions filed an Unopposed Motion for Final Approval of the Settlement on August 23, 2017, and the settlement of the Payment Card Claims in the FICA was granted final approval on September 22, 2017. (Cantarutti Cert., Unopposed Motion for Final Approval of Settlement, Doc. 59-9; Doc. 43-22, PageID 1648-1661.)

30.    Home Depot ultimately settled the Payment Card Claims for more than $172M.[2] (*In re Home Depot Inc.*, 931 F.3d 1065, 1073-1074 (11th Cir. 2019) (CBRP payments); Doc. 43-22 at PageID 1650-1652 (remaining FICA payments); and Doc. 43-23 at PageID 1664 (attorneys' fees).)

## V.    <u>Home Depot's Tenders of the Data Breach Claims to the Cyber and CGL Insurers</u>

31.    As a result of the Data Breach and resulting claims, Home Depot sought coverage under the Cyber Tower.  (*See* Cantarutti Cert., Sept. 4, 2014 Notice of Circumstances to Cyber Tower, Doc. 59-11, PageID 3202-3203.)

---

[2] Steadfast cites this figure for context only – per the Court's order bifurcating this litigation, issues concerning Home Depot's alleged damages await a separate phase of discovery. Accordingly, Steadfast reserves all rights to contest Home Depot's damages claims.

32.     Home Depot's Cyber Tower tender for coverage included both first and third-party losses. (*Id*.; *see* Plaintiffs' July 24, 2017 Letter, Doc. 59-15, PageID 3222.)

33.     In response, the Cyber Insurers, including ZAIC and Steadfast (which respectively sat above AIG in the Cyber Tower), paid their liability limits under their respective Cyber Policies, which effectively exhausted Home Depot's Cyber Tower of coverage. (*See* Doc. 43-25, PageID 1673 ("…payments received to date of $80,000,000, the net coverage…The payments received to date by Home Depot are coming from their Cyber coverage, which we understand is almost exhausted."); Plaintiff's July 24, 2017 Letter, Doc. 59-15, PageID 3222 ("claims exceed the limits of [Plaintiffs'] cyber insurance policies").)

34.     In early 2015, Home Depot also tendered the claims associated with class action lawsuits,[3] which included the Payment Card Claims asserted in the FICA, for coverage under the Steadfast Primary and Excess Policies (collectively, "Steadfast Policies"). (*See* Doc. 43-5.)

35.     In June of 2015, Steadfast issued a coverage position letter disclaiming coverage for the Payment Card Claims in the FICA based on, among other reasons, the following: (1) the allegations in the FICA Consolidated Complaint do not allege "property damage" as defined by the Steadfast Policies; and (2) the application of the Electronic Data Exclusion. (Steadfast's June 2015 Disclaimer, dated June 26, 2015, transmitted via email to Home Depot on June 30, 2015, Doc. 43-6, PageID 1034-1035.)

36.     By letter dated September 25, 2015, Home Depot advised that it disagreed with Steadfast's denial and requested that Steadfast reconsider its position, specifically asserting there was "property damage" alleged because the Financial Institutions sought damages in the form of

---

[3] Several putative class action lawsuits were filed by consumers allegedly impacted from the Data Breach, which we do not address because Home Depot's claim for coverage solely involves the Payment Card Claims. (*See* Consumer Plaintiffs' Consolidated Class Action Complaint, Doc. 59-7.)

costs incurred to reissue Payment Cards that were compromised in the data breach and were, according to Home Depot, no longer usable, even if they were not physically injured ("Home Depot's September 2015 Push Back Letter"). (Cantarutti Cert., Home Depot's September 2015 Push Back Letter, Doc. 59-13, PageID 3211-3213.)

37.     Steadfast responded to Home Depot on November 17, 2016 by reaffirming the denial of coverage and directing Home Depot to Steadfast's coverage position outlined in Steadfast's June 2015 Disclaimer ("Steadfast's November 2016 Disclaimer"). (Steadfast's November 2016 Disclaimer, Doc. 43-7, PageID 1077.)

38.     After almost three and a half years, Home Depot sent another letter to Steadfast on July 7, 2020 again seeking reconsideration of the denial of coverage, particularly with regard to the Financial Institutions' claims with respect to the Payment Cards (the "Payment Card Claims"). (Home Depot's July 2020 Push Back Letter, Doc. 43-14, PageID 1403.)

39.     On January 5, 2021, after being provided some limited documents by Home Depot for evaluation, Steadfast issued its position letter to Home Depot in response to the July 2020 Push Back Letter, which reiterated the prior denial of coverage. (Steadfast's January 2021 Disclaimer, Doc. 43-16, PageID 1421.)

## VI.     Procedural History of the Coverage Action

40.     On April 8, 2021, Home Depot filed an action for declaratory judgment ("the DJ Action") against ZAIC, Steadfast, and Great American in the United States District Court for the Southern District of Ohio, Western Division ("S.D. Ohio"). (Home Depot's Complaint, Doc. 1, PageID 1-14.)

41.     Home Depot's Complaint alleges, among other things, that Steadfast and Great American breached the terms and conditions of their respective policies by disclaiming coverage

obligations for the Payment Card Claims. (*See* Home Depot's Complaint, Doc. 1, PageID 3 and 11.)

42.     Home Depot agreed to voluntarily dismiss ZAIC, which became effective on June 4, 2021. (*See* the Court's June 4, 2021 Order, Doc. 11, PageID 382.)

43.     Both Steadfast and Great American filed their respective Answers on June 21, 2021. (*See* Steadfast's Answer and Separate Defenses, Doc. 21, PageID 414-429; *see also* Great American's Answer, Affirmative Defenses and Counterclaim, Doc. 20, PageID 404-413.)

44.     At the parties request, the Court issued an Order that bifurcated discovery into two phases: (1) the first phase limited to fact and expert discovery related to liability (except as to Plaintiffs' bad faith claim) and whether the Plaintiff suffered a covered loss under the insurance policies; and (2) the second phase, if needed, related to fact and expert discovery relating to bad faith liability and the amount of damages covered under the insurance policies. (*See* the Court's August 25, 2021 Order, Doc. 30, PageID 460.)

45.     The Parties engaged in Phase 1 discovery, which was completed as of September 23, 2022 pursuant to the Court's June 29, 2022 Order. (*See* the Court's June 29, 2022 Order, Doc. 41, PageID 604.)

46.     The Parties are to submit a proposed schedule for Phase 2 Discovery, if Phase 2 is necessary, within seven (7) days of the Court's order on dispositive motions. (*Id*.)

Dated: October 13, 2022                          Respectfully submitted,

                                                  */s/ Kevin M. Young*
                                                 Kevin M. Young (0029715)
                                                 Jennifer L. Mesko (0087897)
                                                 TUCKER ELLIS LLP
                                                 950 Main Ave., Suite 1100
                                                 Cleveland, Ohio 44113-7213
                                                 Telephone: (216) 592-5000
                                                 kevin.young@tuckerellis.com

jennifer.mesko@tuckerellis.com

Kevin T. Coughlin *(pro hac vice)*
Suzanne C. Midlige (*pro hac vice*)
Steven D. Cantarutti (*pro hac vice*)
Patrick A. Florentino (*pro hac vice*)
COUGHLIN MIDLIGE
& GARLAND LLP
350 Mount Kemble Ave.
P.O. Box. 1917
Morristown, New Jersey 07962
Telephone: (973) 267-0058

kcoughlin@cmg.law
smidlige@cmg.law
scantarutti@cmg.law
pflorentino@cmg.law

*Attorneys for Defendant*
*Steadfast Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date set forth below, the foregoing Defendant Steadfast Insurance Company's Responses to Plaintiffs' Proposed Undisputed Facts and Additional Proposed Undisputed Facts in Support of its Cross-Motion for Summary Judgment, was filed using the CM/ECF system, which will automatically provide notice to all counsel of record by electronic means.

Dated: October 13, 2022                     Respectfully Submitted,

                                            _/s/ Kevin M. Young_____
                                            Kevin M. Young (0029715)
                                            *One of the Attorneys for Defendant*
                                            *Steadfast Insurance Company*