**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| THE HOME DEPOT, INC. and HOME DEPOT U.S.A., INC., | Civil Action No. 1:21-cv-00242-SJD |
| Plaintiffs, | District Judge Susan Dlott |
| v. | |
| STEADFAST INSURANCE CO.; ZURICH AMERICAN INSURANCE CO.; and GREAT AMERICAN ASSURANCE CO., | |
| Defendants. | |

**DEFENDANT STEADFAST INSURANCE COMPANY'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS CROSS-MOTION FOR**
**SUMMARY JUDGMENT AGAINST PLAINTIFFS AND IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................1

FACTUAL BACKGROUND .......................................................................................4

    A.    Home Depot's CGL Tower.................................................................................4

    B.    Home Depot's Cyber Tower .............................................................................6

    C.    The 2014 Data Breach of Electronic Payment Card Data .......................................7

    D.    The Financial Institutions' Class Action (FICA)..................................................8

    E.    Home Depot's Tenders of the Data Breach Claims to the Cyber and CGL Insurers ............................................................................................9

LEGAL ARGUMENT .............................................................................................11

I.    THE PARTIES AGREE THAT GEORGIA LAW GOVERNS THIS CONTRACT DISPUTE..................................................................................11

II.    STEADFAST HAS NO DUTY TO INDEMNIFY THE PAYMENT CARD CLAIMS .............................................................................................12

    A.    The Payment Card Claims Are Not "Property Damage" for "Loss of Use of Tangible Property"..................................................................................13

        1.    The Payment Card Claims Are Damages to Intangible Property, which is Not Covered..................................................................13

        2.    The Data Breach Did Not Render the Payment Cards Useless or Unusable .......................................................................16

        3.    "Loss of Use" Coverage in CGL Policies Does Not Extend to Permanent Losses .........................................................................21

    B.    There is No Property Damage Caused By An "Occurrence" ................................23

i

III.     THE ELECTRONIC DATA EXCLUSION BARS COVERAGE FOR THE PAYMENT CARD CLAIMS ............................................................................24

IV.    HOME DEPOT'S RELIANCE ON A REVISED ELECTRONIC DATA EXCLUSION ISSUED IN 2016 IS NOT ONLY MISPLACED BUT SUPPORTS A RULING IN FAVOR OF INSURERS ......................................................30

V.     HOME DEPOT'S BREACH OF CONTRACT CLAIMS SHOULD BE LIMITED TO WHETHER THE INSURERS HAVE A DUTY TO INDEMNIFY ................................................................................................................33

VI.    CONCLUSION................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Network, Inc. v. Peerless Ins. Co.*,
  190 Cal. App. 4th 1054 (Cal. App. 4th Dist. 2010) ................................................................21

*Ainsworth v. Perreault*,
  563 S.E.2d 135 (Ga. App. 2002) .............................................................................................11

*Allstate Ins. Co. v. Airport Mini Mall, LLC*,
  265 F. Supp. 3d 1356 (N.D. Ga. 2017) ...................................................................................34

*Allstate Prop. & Cas. Ins. Co. v. Roberts*,
  696 F. App'x 453 (11th Cir. 2017) ..........................................................................................23

*Am. Online, Inc. v. St. Paul Mercury Ins. Co.*,
  347 F.3d 89 (4th Cir. 2003) .....................................................................................................15

*Auto-Owners Ins. Co. v. Parks*,
  278 Ga. App. 444 (Ga. App. 2006) ..........................................................................................28

*Bering v. Interins. Exch. of the Auto. Club*,
  2002 WL 31320598 (Cal. Ct. App. Oct. 17, 2002) ................................................................21

*Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*,
  498 S.E.2d 492 (Ga. 1998) ......................................................................................................11

*Brogdon v. Pro Futures Bridge Cap. Fund, L.P.*,
  580 S.E.2d 303 (Ga. App. 2003) .............................................................................................11

*Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*,
  2016 WL 6217161 (N.D. Al. Oct. 25, 2016) ................................................................ *passim*

*Ciber, Inc. v. Fed. Ins. Co.*,
  2018 WL 1203157 (D. Colo. 2018) .........................................................................................14

*Cincinnati Ins. Co. v. Magnolia Estates, Inc.*,
  648 S.E.2d 498 (Ga. App. 2007) .............................................................................................23

*Collin v. Am. Empire Ins. Co.*,
  21 Cal. App. 4th 787 (Cal. Ct. App. 1994) .............................................................................21

*Crook v. Ga. Farm Bureau Mut. Ins. Co.*,
  428 S.E.2d 802 (Ga. App. 1993) .............................................................................................23

*Drake-Williams Steel, Inc. v. Cont'l Cas. Co.*,
 294 Neb. 386, 883 N.W.2d 60 (Neb. 2016) ..........................................22

*Envision Printing, LLC v. Evans*,
 786 S.E.2d 250 (Ga. App. 2016) ...........................................................11

*Eyeblaster, Inc. v. Fed. Ins. Co.*,
 613 F.3d 797 (8th Cir. 2010) ................................................................20

*F & H Const. v. ITT Hartford Ins. Co. of Midwest*,
 12 Cal. Rptr. 3d 896 (Cal. Ct. App. 2004) ...........................................18

*Fireman's Fund Ins. Co. v. Univ. of Ga. Ath. Ass'n*,
 654 S.E.2d 207 (Ga. App. 2007) ...........................................................26

*G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*,
 768 Fed. App'x 982 (11th Cir. 2019) ....................................................24

*General Steel v. Delta Bldg. Sys.*,
 676 S.E.2d 451, 453 (Ga. App. 2009) ...................................................11

*Hartzell Industries v. Federal Insurance Co.*,
 168 F. Supp. 2d 789 (S.D. Ohio 2001) .................................................19

*Hays v. Ga. Farm Bureau Mut. Ins. Co.*,
 722 S.E.2d 923 (Ga. App. 2012) ...........................................................26

*Ill. Mun. League Risk Mgmt. Ass'n v. City of Collinsville*,
 100 N.E.3d 185, 2018 IL App (4th) 170015 (Ill. Ct. of App. 2018) ......22

*In re: The Home Depot, Inc., Customer Data Security Breach Litig.*,
 931 F.3d 1065 (11th Cir. 2019) ..............................................................9

*Int'l Ins. Co. of Hannover, S.E. v. Morrowood Townhouses, LLC*,
 2015 WL 11455589 (N.D. Ga. Nov. 4, 2015) .......................................34

*Liberty Mut. Ins. Co. v. Wheelwright Trucking Co.*,
 851 So. 2d 466 (Ala. 2002) ...................................................................19

*Macon Iron & Paper Stock Co. v. Transcontinental Ins. Co.*,
 93 F. Supp. 2d 1370 (M.D. Ga. 1999) ..................................................24

*Nationwide Mut. Fire Ins. Co. v. Somers*,
 591 S.E.2d 430 (Ga. App. 2003) ...........................................................23

*Nautilus Ins. Co. v. Philips Med. Sys. Nederland B.V.*,
 549 F. Supp. 3d 449 (W.D.NC. 2021) ...................................................14

*Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co.*,
142 A.3d 761 (N.J. App. Div. 2016)........................................................................19

*Recall Total Information Management., Inc. v. Federal Insurance Co.*,
No. X07CV095031734S, 2012 WL 469988 (Conn. Super. Ct. Jan. 17, 2012) ......................25

*Robert Bowden, Inc. v. Aetna*,
977 F.Supp. 1475 (N.D. Ga. 1997) ........................................................................14

*Rucker v. Columbia Nat'l Ins. Co.*,
705 S.E.2d 270 (Ga. App. 2010)........................................................................23

*RVST Holdings, LLC v. Main Street America Assurance Co.*,
136 A.D.3d 1196 (N.Y. 3rd Dept. 2016) ........................................................................27, 29

*Sapp v. State Farm Fire & Cas. Co.*,
226 Ga. App. 200 (Ga. Ct. App. 1997) ........................................................................31

*Silgan Containers Corp. v. Nat'l Union Fire Ins. Co.*,
434 Fed. Appx. 709 (9th Cir. 2011) ........................................................................18

*Sony Computer Entm't Am. v. Am. Home Assur. Co.*,
532 F.3d 1007 (9th Cir. 2008) ........................................................................14

*Southern Guar. Ins. Co. v. Dowse*,
605 S.E.2d 27 (Ga. 2004)........................................................................34

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
533 F.3d 162 (3d Cir. 2008)........................................................................20, 21

*Target Corp. v. ACE Am. Ins. Co.*,
2022 WL 848095 (D. Minn. Mar. 22, 2022) ........................................................................16, 20

*Taylor Morrison Servs. v HDI-Gerling Am. Ins. Co.*,
293 Ga. 456 (Ga. 2013)........................................................................23

*Thomas Mach., Inc. v. Everest Nat'l Ins. Co.*,
571 F. Supp. 3d 1326 (S.D. Fla., 2021) ........................................................................19

*Triple Eagle Assocs., Inc. v. PBK, Inc.*,
704 S.E.2d 189 (Ga. App. 2010)........................................................................11

*Wisc. Pharm Co v. Neb Cultures*,
876 N.W.2d 72 (Wis. 2016)........................................................................18, 22

**Statutes**

O.C.G.A. § 13-2-2 (2)...................................................................................................11

O.C.G.A. § 1-3-3 (2)....................................................................................................23

O.C.G.A. § 13-3-2 (2)...................................................................................................28

Defendant, Steadfast Insurance Company ("Steadfast") respectfully submits this Memorandum of Law in: (1) Support of Steadfast's Cross-Motion for Summary Judgment on Liability ("Cross-Motion") against Plaintiffs, The Home Depot, Inc. ("HDI") and Home Depot U.S.A., Inc. ("HDU") (collectively "Home Depot" or "Plaintiffs"); and (2) Opposition to Plaintiffs' Motion for Partial Summary Judgment on Liability ("Motion") against the Defendants (Doc. Nos. 43-44).

<u>**PRELIMINARY STATEMENT**</u>

Plaintiffs' action against Defendants seeks coverage under commercial general liability ("CGL") insurance policies for claims arising out of a data breach that occurred from April through September 2014. The breach was perpetrated by criminal hackers, who surreptitiously attacked Home Depot's computer payment system by installing malicious software (hereinafter "malware"). The breach went undetected for almost five (5) months, during which the hackers had carte blanche access to credit card numbers and email addresses belonging to millions of Home Depot's customers.

The breach was discovered in early September 2014, and soon after numerous class action lawsuits were brought against Home Depot. Many of those lawsuits were brought by financial institutions that issued credit card accounts to Home Depot's customers ("Financial Institutions"). The Financial Institutions alleged, among other things, that Home Depot failed to properly protect and safeguard the customers' personal and financial information in Home Depot's computer network and further alleged damages in the form of lost revenues and costs associated with replacing the cards. Home Depot ultimately settled the Financial Institutions' class action lawsuits for more than $172M. Home Depot recovered $100M from its cyber insurers, including Steadfast, relating to losses incurred from the data breach. Because Home Depot failed to purchase a

sufficient amount of cyber coverage, it now seeks to recover the shortfall and unspecified defense costs from its CGL insurers.

Home Depot contends that the damages it seeks from Steadfast qualify as "property damage" caused by an "occurrence" as those terms are defined in the Steadfast CGL primary and excess policies. Home Depot further contends it has satisfied the following three requirements to trigger coverage under the Steadfast policies: (1) the payment cards were tangible property not physically injured; (2) the Financial Institutions lost the use of the cards; and (3) the loss of use was caused by an "occurrence." Home Depot also disputes the applicability of the exclusion for "electronic data" ("Electronic Data Exclusion") as a bar to coverage.

The parties do not dispute the payment cards were not physically injured. Nor is there any dispute that the payment cards remained usable during the five (5) month period when the data breach went undetected.[1] Where the parties diverge is on what happened next. Upon discovery of the breach in September 2014, *some* Financial Institutions made the decision to replace the payment card data, which in their estimation was compromised and no longer secure. Home Depot argues that the Financial Institutions' decision to cancel the payment card data resulted in a complete "loss of use," thereby bringing the claim within the definition of "property damage" under the Steadfast policies.

Home Depot's argument reflects a lack of understanding of the way a payment card works, which is to electronically send account data (*i.e.*, account number, expiration date, three-digit security code, and expiration date) from the retail company's computer system to its acquiring bank, and from there to the credit card network for payment authorization. Thus, it was the payment card data (encoded on the back of the physical cards) that is necessary to access the credit

---

[1] *See* Home Depot's Memorandum of Law in Support of Motion for Partial Summary Judgment on Liability ("Home Depot's MOL"), at 2.

accounts for point-of-sale transactions, such as at a retail store.  In fact, Home Depot undercuts its own argument when it concedes the payment cards were usable for the 5 months when the breach went undetected and only "lost complete use" when the Financial Institutions were allegedly "forced to cancel them."[2]

Home Depot also conveniently ignores a critical limitation written into the definition of "property damage."  Although the Steadfast policies cover loss of use of tangible property that has not been physically injured, they expressly do not cover loss of use of electronic data, which is defined as "intangible property."  Courts across several jurisdictions have consistently held that intangible property does not fall within the definition of "property damage."  Home Depot further ignores that the term "loss of use" has been interpreted as impermanent or temporary loss. Under Home Depot's logic, cancellation of a payment account cannot be construed as meeting this interpretation.

The limitation of coverage under the Steadfast policies is further reinforced by the Electronic Data Exclusion, which precludes coverage for "[d]amages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data."  Georgia courts interpreting the term "arising out of" within the context of a policy exclusion have consistently applied the "but-for, cause-in-fact relationship" test (*i.e.*, when, "but for" that excluded conduct, there could be no claim against the insured).  There is no question that "but for" the "loss of," "corruption of," and/or "damage to," electronic data, the Financial Institutions would not have incurred the alleged damages, including the replacement costs of the payment cards.

---

[2] *Id.*

Based upon the foregoing reasons, as well as those discussed below and in the arguments presented by Defendant Great American Assurance Co. ("Great American"),[3] Steadfast respectfully submits the Court should grant the Cross-Motion for Summary Judgment, deny Home Depot's Motion, and declare that Steadfast has no duty to defend or indemnify Home Depot for the payment card claims at issue.

## FACTUAL BACKGROUND

**A.    Home Depot's CGL Tower**

In 2014, Home Depot maintained several CGL insurance policies (generally referred to as the "CGL Tower"). (Doc. 43-1 at PageID 616, ¶¶ 2-5.) The CGL Tower included the following self-insured retentions ("SIR"), deductibles and liability limits:

| CGL Insurer and Policy No. | Limit and Underlying Amounts |
|---|---|
| Home Depot's "First" SIR | $1M SIR |
| Steadfast Insurance Company No. GLO 04887714-04 (eff. 3/1/14-3/1/15) ("Steadfast Primary Policy") | $9M Limit with $9M Matching Deductible |
| Home Depot's "Second" SIR | $15M SIR |
| Steadfast Insurance Company No. IPR3757608-04 (eff. 2/1/13-3/1/16) ("Steadfast Excess Policy") | $25M excess $25M |
| Great American Assurance Co. No. UMB 1910640 (eff. 3/1/14-3/1/15) ("Great American Excess Policy") | $25M excess $50M |

(Doc. 43-1 at PageID 617-618, ¶ 6.)

The Steadfast Primary Policy acts as a "fronting policy" by virtue of its $9M matching deductible amount in excess of the $1M SIR. (Doc. 43-1 at PageID 616-617, ¶ 3.) Thus, Home

---

[3] Great American's commercial umbrella policy issued to Home Depot contains policy language that is similar or the same as in Steadfast's CGL policies.  Steadfast, therefore, incorporates the arguments presented in Great American's memorandum in opposition to Home Depot's Motion and in support of Great American's cross-motion for summary judgment.

Depot is financially responsible for the entire $25M liability limit falling within the SIRs and/or deductible amount for any covered claim. (*Id.*)

The Steadfast Primary Policy contains the following relevant definitions:

> 14. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> \*\*\*
>
> 18. "Property damage" means:
>
> **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> For the purposes of this insurance, electronic data is not tangible property.
>
> As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(*See* Steadfast Primary Policy, Doc 43-2 at PageID 677-678.)

The definition of "property damage" covers "loss of use of *tangible* property that is not physically injured," but expressly carves out "electronic data" from being tangible property (emphasis in italics). (*Id.*)

The Steadfast Primary Policy also contains the Electronic Data Exclusion that excludes coverage for:

> **p. Electronic Data**
>
> Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.
>
> As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications

> software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

(Steadfast Primary Policy, Doc 43-2 at PageID 667.)

The Steadfast Excess Policy includes a sublimit of liability for Excess Liability in the amount of $25M Per Loss in excess of $25M (comprised of the first $1M SIR, the $9M Deductible, and the second $15M SIR). (Steadfast Excess Policy, Doc 43-3.) The Steadfast Excess Policy applies in "conformance with and subject to the definitions, insuring clause(s), exclusions and conditions of the Controlling Policy." (Steadfast Excess Policy, Doc 43-3 at PageID 775.) As such, the Steadfast Excess Policy "follows form" to the Steadfast Primary Policy, including the CGL Coverage Form, unless they are inconsistent, in which case the conflicting language in the Steadfast Excess Policy shall control. (*Id.*)[4]

## B. Home Depot's Cyber Tower

In 2014, Home Depot also maintained a tower of Errors & Omissions insurance policies that provided insurance coverage for cyber-related risks (the "Cyber Policies" or "Cyber Tower"). (*See* Home Depot's Sept. 4, 2014 Notice of Circumstances to Cyber Tower, Doc. 59-11; Marsh September 29, 2014 Letter to Insurers, Doc. 59-12 at PageID 3207-3208.) The primary policy for Home Depot's Cyber Tower was a Specialty Risk Protector insurance policy issued by AIG Specialty Insurance Company ("AIG") to HDI (the "AIG Cyber Policy") with a limit of liability of $10M, and a "retention" of $7.5M. (AIG Cyber Policy, Doc. 59-10 at PageID 3118-3119.) The excess layer policies in the Cyber Tower generally "follow form" to the AIG Cyber Policy. The Cyber Tower had a total liability limit of $100M above the deductible/attachment or retention

---

[4] The Excess Liability Coverage Form of the Steadfast Excess Policy is generally consistent with the pertinent definitions, insuring agreements, exclusions and conditions in the Steadfast Primary Policy discussed herein.

amount. Steadfast participated on the Cyber Tower with a policy of $10M in excess of $20M.[5]

(Marsh September 29, 2014 Letter to Insurers, Doc. Doc. 59-12 at PageID 3207-3208.)

## C. The 2014 Data Breach of Electronic Payment Card Data

On September 2, 2014, Home Depot received reports from banking partners and law enforcement officials that Home Depot had suffered a significant cybersecurity breach involving its payment data systems. (Home Depot's Recitation of Joint Preliminary Report and Discovery Plan, Doc. 59-8 at PageID 3038; Sept. 8, 2014 Press Release, Doc. 59-2 at PageID 2682.) Investigation revealed that Home Depot sustained computer data breaches from April 2014 through its discovery in early September 2014 (collectively the "Data Breach"). (Plaintiffs' Complaint, Doc. 1 at PageID 8, ¶ 41; Consol. Complaint, Doc. 59-7 at PageID 2844 and 2941.) The Data Breach was perpetrated by criminal hackers, who installed custom-built malware at thousands of point-of-sale terminals located at Home Depot retail stores in the United States and Canada, resulting in the unauthorized access to personal information and electronic payment card data belonging to millions of consumers. (Consol. Complaint, Doc. 59-7 at PageID 2845-2847; Nov. 6, 2014 Press Release, Doc. 59-4 at PageID 2706-2707; Plaintiffs' Complaint, Doc. 1 at PageID 8, ¶¶ 41-42.) On September 8, 2014, Home Depot issued its first press release explaining that its "payment data systems had been breached" and that it was taking "aggressive steps to address the malware and protect customer data." (September 8, 2014 Press Release, Doc. 59-2 at PageID 2681.)

On September 18, 2014, Home Depot issued a second press release advising, among other things, that: "The cyber-attack is estimated to have put payment card information at risk for approximately 56 million unique payment cards"; and "The hackers' method of entry has been

---

[5] Another Zurich company, Zurich American Insurance Company ("ZAIC"), participated in the Cyber Tower with a policy of $10M in excess of $10M under the AIG Cyber Policy.

closed off, the malware has been eliminated from the company's systems, and the company has rolled out enhanced encryption of payment data to all U.S. stores." (September 18, 2014 Press Release, Doc. 59-3 at PageID 2694.) Home Depot also advised that "[t]here is no evidence that debit PIN numbers were compromised or that the breach ha[d] impacted stores in Mexico or customers who shopped online[.]" (*Id.*)

On November 6, 2014, Home Depot issued a final press release regarding the Data Breach advising that its investigation determined:

- "The criminals used a third-party vendor's user name and password to enter the perimeter of Home Depot's network";
- "The hackers then acquired elevated rights that allowed them to navigate portions of Home Depot's network and to deploy unique, custom-built malware on its self-checkout systems in the U.S. and Canada"; and
- "In addition to the previously disclosed payment card data [associated with 56 million unique payment cards], separate files containing approximately 53 million email addresses were also taken during the breach" which "did not contain passwords, payment card information or other sensitive personal information."

(Nov. 6, 2014 Press Release, Doc. 59-4 at PageID 2706-2707.)

It remains undisputed that the Data Breach did not result in any physical damage to the impacted payment cards ("Payment Cards"). (Plaintiffs' Complaint, Doc. 1 at PageID 2, ¶ 41.) It is further undisputed that the Payment Cards remained fully functional during the Data Breach and after its discovery, until the Financial Institutions made the decision to replace the Payment Cards.

## D. The Financial Institutions' Class Action (FICA)

Soon after news of the Data Breach became public, several putative class action lawsuits were filed by the Financial Institutions against Home Depot, which were consolidated in the United States District Court for the Northern District of Georgia, *In re: The Home Depot, Inc. Customer Data Security Breach*, *Relating to: All Financial Institution Cases*, No. 1:14-md-02583-TWT (N.D. Ga.) (hereinafter, the "Financial Institutions' Class Action" or "FICA"). (Home Depot's

Recitation of Joint Preliminary Report and Discovery Plan, Doc. 59-8 at PageID 3041; *see* Consol. Complaint, Doc. 43-19; Plaintiffs' Complaint, Doc. 1 at PageID 9, ¶ 47.) )

The Financial Institutions alleged, *inter alia*, that Home Depot failed to properly protect and safeguard payment card data and/or sensitive personal identifiable information (collectively, the "Payment Card Data") stored electronically on Home Depot's computer systems, resulting in the criminal use of the Payment Card Data. (Consol. Complaint, Doc. 43-19 at PageID 1450 and 1472, ¶¶ 1 and 89-90.) The Financial Institutions further alleged, *inter alia*, damages from the Data Breach as a result of: voluntarily cancelling and reissuing the payment cards; reimbursements for fraudulent transactions; lost revenues due to reduced card usage (*i.e.*, reduced transaction fees or interests); and other damages associated with the investigation of the losses and notifying customers (the collectively, the "Payment Card Claims"). (Consol. Complaint, Doc. 43-19 at PageID 1507-1508, 1519, 1522, ¶¶ 186, 187, 214, 221.)

Home Depot ultimately settled the Payment Card Claims for approximately $172 M. (*In re Home Depot Inc., Customer Data Sec. Breach Litig.*, 931 F.3d 1065, 1073-1074 (11th Cir. 2019) (CBRP payments); Doc. 43-22 at PageID 1650-1652 (remaining FICA payments); and Doc. 43-23 at PageID 1664 (attorneys' fees).) The settlement in the FICA was granted final approval on September 22, 2017. (Doc. 43-22, PageID 1648-1661.)

## E. Home Depot's Tenders of the Data Breach Claims to the Cyber and CGL Insurers

As a result of the Data Breach and resulting claims, Home Depot sought coverage under the Cyber Tower. (Sept. 4, 2014 Notice of Circumstances to Cyber Tower, Doc. 59-11, PageID 3200-3205.) Home Depot's Cyber Tower tender for coverage included both first and third-party losses. (*Id*.) In response, the Cyber Tower insurers, including Steadfast, paid their respective liability limits totaling $100M, effectively exhausting the coverage in the Cyber Tower of

coverage. (Doc. 43-25, PageID 1673; Marsh September 29, 2014 Letter to Insurers, Doc. 59-12 at PageID 3207-3208.)

In early 2015, Home Depot also tendered the claims associated with class action lawsuits,[6] which included the Payment Card Claims asserted in the FICA, for coverage under the Steadfast Primary and Excess Policies (collectively, "Steadfast Policies"). (Doc. 43-1 at 5, ¶ 13; Doc. 43-5.) Steadfast issued a coverage position letter disclaiming coverage for the Payment Card Claim because, among other things: (1) the allegations in the FICA Consolidated Complaint did not allege "property damage" as defined by the Steadfast Policies; and (2) the Electronic Data Exclusion applied to preclude coverage.[7] (Steadfast's June 2015 Disclaimer, Doc. 43-6, PageID 1034-1035.)

After almost three and a half years had passed, Home Depot renewed its demand for coverage of the Payment Card Claims under the Steadfast Policies. (Home Depot's July 2020 Push Back Letter, Doc. 43-14, PageID 1403.) Steadfast reiterated its denial of coverage. (Steadfast's January 2021 Disclaimer, Doc. 43-16, PageID 1421.) Shortly thereafter, Home Depot proceeded to file this action. (Home Depot's Complaint, Doc. 1, PageID 1-14.)

---

[6] Several putative class action lawsuits were filed by consumers allegedly impacted from the Data Breach (*e.g.*, the *Solak* Lawsuit) (*see* Doc. 43-5; Consumer Consol. Class Action Complaint, Doc. 59-7), which we do not address because Home Depot's claim for coverage solely involves the Payment Card Claims.
[7] Steadfast reiterated its denial of coverage on November 17, 2016. (Doc. 43-7, PageID 1077.)

## <u>LEGAL ARGUMENT</u>

## I. **THE PARTIES AGREE THAT GEORGIA LAW GOVERNS THIS CONTRACT DISPUTE**

Georgia law is clear that "construction [of a contract] is a matter of law for the court." *Envision Printing, LLC v. Evans*, 786 S.E.2d 250, 252 (Ga. App. 2016). Insurance contracts are treated like any other contract and "are interpreted by [the] ordinary rules of contract construction." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 498 S.E.2d 492, 494 (Ga. 1998). Construction of a contract requires three steps:

> First, the trial court must decide whether the language is clear and unambiguous. If it is, no construction is required, and the court simply enforces the contract according to its clear terms. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury.

*Envision Printing*, 786 S.E.2d at 252 (quoting *General Steel v. Delta Bldg. Sys.*, 676 S.E.2d 451, 453 (Ga. App. 2009)).

With respect to the first step, "[t]he court [initially] looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed." *Brogdon v. Pro Futures Bridge Cap. Fund, L.P.,* 580 S.E.2d 303, 306 (Ga. App. 2003). Under that analysis, "[w]ords generally [are ascribed] their usual and common signification." O.C.G.A. § 13-2-2(2). "[W]here the language of [the] contract is clear, unambiguous, and capable of only one reasonable interpretation, no construction is necessary or even permissible by the trial court." *Ainsworth v. Perreault*, 563 S.E.2d 135, 140-41 (Ga. App. 2002); *see also Triple Eagle Assocs., Inc. v. PBK, Inc.*, 704 S.E.2d 189, 195-96 (Ga. App. 2010) ("where the terms of a written contract are plain and

unambiguous, a court must confine itself to the four corners of the document to ascertain the parties' intent").

Under the clear and established rules of contract interpretation, the Court should enforce the Steadfast Policies as written and declare that the policy purchased by Home Depot does not afford any coverage for the Payment Card Claims as a matter of law.

## II.   STEADFAST HAS NO DUTY TO INDEMNIFY THE PAYMENT CARD CLAIMS

Home Depot contends the Payment Card Claims qualify as damages because of "property damage," which is defined to include "[l]oss of use of tangible property that is not physically injured."[8]  According to Home Depot, it has satisfied the following three requirements to trigger coverage within the Steadfast Excess Policy's Insuring Agreement: (1) the Payment Cards were tangible property that were not physically injured; (2) the Financial Institutions lost the use of the cards; and (3) the loss of use was an "occurrence." [9]

Home Depot's three-pronged argument is flawed.  Its legal obligation to pay damages was not due to damage to tangible property, but rather due to compromised electronic data and the Financial Institutions' decision to replace the Payment Card Data. Moreover, courts across the country have consistently held that damage to intangible property is not covered under CGL policies.  Home Depot also fails to establish there was any loss of use, whether partial or complete, of the Payment Cards themselves, and has not explained how the Financial Institutions' decision to intentionally cancel or reissue Payment Cards amounts to an "occurrence."  Summary judgment, therefore, must be denied to Home Depot and granted to the Insurers.

---

[8] Home Depot does not assert the Payment Card Claims qualify as damages because of "[p]hysical injury to tangible property . . ."
[9] Home Depot's MOL at 9-10.

### A. The Payment Card Claims Are Not "Property Damage" for "Loss of Use of Tangible Property"

#### 1. The Payment Card Claims Are Damages to Intangible Property, which is Not Covered

As set forth above, it is undisputed that the physical payment cards are "tangible property." It is similarly undisputed that the payment cards were not physically injured. What is in dispute is the cause of the injury. In an effort to bring the Payment Card Claims within the scope of coverage provided in the Steadfast Policies, Home Depot relies on an allegation made by the Financial Institutions that the "cards were 'compromised' because of the data breach." [10] This, argues Home Depot, confirms that the damages were covered *tangible* property. Steadfast disagrees. The claims associated with the Payment Cards did not result from the Data Breach. They resulted from damage to uncovered *intangible* property, specifically the compromised electronic data, which "[f]or the purposes of this insurance, […] is not tangible property[,]" and, therefore, not "property damage." [11] (Doc. 43-2 at PageID 677-678.)

The gravamen of the Financial Institutions' Consolidated Complaint is that Home Depot failed to properly protect and safeguard the electronically-stored Payment Card Data in Home Depot's computer systems. (*See, e.g.,* Consol. Compl., Doc 43-19, PageID 1450-1451 and 1474-1475, ⁋ 2 ("The data breach was the inevitable result of Home Depot's longstanding approach to the security of its customer's confidential data, an approach characterized by neglect, incompetence, and an overarching desire to minimize costs."); ⁋ 3 ("Home Depot's data security deficiencies were so significant that, even after hackers entered its systems, their activities went

---

[10] *See* Home Depot's MOL at 10.
[11] Electronic data is defined in the definition of "property damage" as "information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications, software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment." (Steadfast Primary Policy at CGL Coverage Form, Section V. (18.), Doc. 43-2 at PageID 677-678).

undetected for approximately five months, despite red flags that should have caused Home Depot to discover their presence and thwart, or at least, limit the damage."); ¶ 95 (Home Depot's treatment of the sensitive personal and financial information entrusted to it has been woefully inadequate for years."); ¶ 96 ("Up through and including the period during which the 2014 breach occurred, Home Depot's data security systems suffered from many deficiencies that made them vulnerable to hackers, including without limitation the following . . .").)

The Financial Institutions' allegations, therefore, centered on the compromised electronic data, which rendered the payment accounts less safe and secure to use, not the actual physical Payment Cards themselves. Several Circuit and District Courts have already held that damage or loss of use of *intangible* property, such as electronic data, does not trigger a coverage obligation under a CGL policy. *Camp's Grocery, Inc. v. State Farm Fire & Cas. Co.*, 2016 WL 6217161, *21 (N.D. Al. Oct. 25, 2016) (breach of credit card data and subsequent replacement cost claims fall outside of the insuring agreement for property damage); *Ciber, Inc. v. Fed. Ins. Co.*, 2018 WL 1203157, *8-9 (D. Colo. 2018) (no loss of use alleged because allegations arose from software inadequacy); *Robert Bowden, Inc. v. Aetna*, 977 F. Supp. 1475 (N.D. Ga. 1997) (complaint alleging copyright infringement claims associated with insured's unauthorized duplication of software onto hard disks of its personal computers is not property damage for "loss of use of tangible property that is not physically injured"); *Nautilus Ins. Co. v. Philips Med. Sys. Nederland B.V.*, 549 F. Supp. 3d 449 (W.D. N.C. 2021) (despite insured's claims, the underlying lawsuit alleging unauthorized access to and copying of proprietary software is not sufficient to trigger coverage for tangible property); *see also Sony Computer Entm't Am. v. Am. Home Assur. Co.,* 532 F.3d 1007, 1019 (9th Cir. 2008) (rejecting Sony's argument the underlying class actions constituted "classic loss of use" claims where the alleged design defects caused the PlayStation 2 gaming system to be unable to

read CDs or DVDs, not because of defects in the discs themselves.); *Am. Online, Inc. v. St. Paul Mercury Ins. Co.,* 347 F.3d 89 (4th Cir. 2003) (explaining that damage to software is not damage to physical property).

In *Camp's Grocery, supra.,* the District Court for the Northern District of Alabama rejected an insured's claim for loss of use of customers' payment cards following a data breach strikingly similar to Home Depot. The insured, a grocery store operator (Camp's), was sued by credit unions alleging that Camp's computer network was hacked, compromising confidential customer data, including payment card information. *Camp's Grocery*, 2016 WL 6217161, at *2. The credit unions alleged Camp's was liable because it failed to provide adequate computer security and employee training to prevent the data breach. Camp's, in turn, filed a coverage action against its liability insurer seeking coverage for "property damage." Camp's contended the credit unions claimed covered losses, among other things, because cancelled and replaced physical debit cards were "tangible property that can be touched and handled." [12] *Id.* at *20-21.

The District Court disagreed that the underlying credit unions' claims constituted "property damage" within the meaning of the Business Liability (Coverage L) coverage form, which is similar to the CGL coverage form.[13] As the District Court succinctly held:

> The Credit Unions do not assert that Camp's acts or omissions caused physical harm or damage to any cards as tangible property. Rather, the Credit Unions assert that Camp's lax computer network security allowed *the intangible electronic data contained on the cards* to be compromised such that the magnetically encoded card numbers could no longer be used, causing purely economic loss flowing from the need to issue replacement cards with new electronic data.

---

[12] As is the case here, the credit unions specifically alleged that they suffered losses on cardholder accounts that included "reissuance of cards, reimbursement of their customers for fraud losses, lost interest and transaction fees, lost customers, diminished good will, and administrative expenses associated with investigating, correcting, and preventing fraud." *Id.* at *2.

[13] Although the District Court denied coverage as to all coverage parts, we focus on Coverage L because of its similarity to the CGL coverage form.

*Id.* at \*21 (italics in original).[14]

Not surprisingly, Home Depot ignores *Camp's Grocery,* and instead heavily relies upon the recent decision in *Target Corp. v. ACE Am. Ins. Co.*, 2022 WL 848095 (D. Minn. Mar. 22, 2022), a non-binding district court decision from the Eighth Circuit, in support of its claim that the Payment Cards constitute "tangible property that is not physically injured."[15] The *Target* Court, in reversing itself from a decision one year earlier when it initially concluded there was no "loss of use" of the payment cards at issue, offers little rationale for its revised decision and does not address other persuasive authorities, such as *Camp's Grocery.* Notably, however, the motion for summary judgment was presented on a different record. For one, the *Target* Court did not have the benefit of expert discovery and similarly was not asked to address the Electronic Data Exclusion. Thus, *Target* provides little guidance here.

### 2. The Data Breach Did Not Render the Payment Cards Useless or Unusable

Home Depot repeatedly relies on the premise that the "Financial Institutions [] sought damages because of loss of use of the compromised plastic payment cards."[16] In doing so, Home Depot erroneously concludes there was *partial* and *complete* loss of use of the Payment Cards, both of which are covered.

A close review of the allegations made by the Financial Institutions makes clear that they did not assert the Payment Cards were unusable, did not function, or were otherwise impacted from the breach itself. In fact, the term "loss of use" was never alleged in the Financial Institutions' Consolidated Complaint. Rather, the Financial Institutions asserted the Payment Cards had to be cancelled or reissued, to mitigate potential risk of fraud, which is different than a covered "loss of

---

[14] The district court also found that the electronic data exclusion applied to preclude coverage, which is discussed further below.
[15] *See* Home Depot's MOL at 10.
[16] *Id.* at 10-13.

use" claim.[17]  Home Depot also provides no evidence to support its statement that the Payment Cards were not usable or less usable as a result of the Data Breach.  If anything, Home Depot undercuts its own argument when it concedes that the Payment Cards were usable between April and September 2014, when the breach was discovered.

In contrast, Insurers' expert, Donald J. Good,[18] rendered an unrebutted opinion,[19] dated May 20, 2022, in which he opines that the Payment Cards continued to function both during and after the Data Breach, and were not damaged or rendered less useful as a result.  (Good Report, Doc. 59-5 at PageID 2723 and 2726.) Mr. Good opines that the Payment Cards had "no diminished capabilities" and only "the account data stored electronically on customer payment cards" was compromised. (*Id*.)  According to Mr. Good, since the Payment Cards were "not rendered less useful or useless, the step of card replacement [was] not a necessary or immediate step for consumer protection." (*Id*. at PageID 2725.)  In other words, the Payment Cards continued to be used and were usable until the Financial Institutions made a business decision to deliberately and remotely cancel the accounts based on security concerns over access of the Payment Card Data.

Mr. Good explains the function of Payment Cards is to relay the Payment Card Data from a merchant's computer system (*i.e.*, account number, expiration date, three-digit security code) to authorize access for credit lines.  (*Id*. at PageID 2724.)  That Payment Card Data is sent from the merchant's computer system to its bank (known as the "acquiring bank"), which, in turns, sends the payment information to the applicable credit card network (Visa, Mastercard, *etc.*).  If the funds

---

[17] *See* Section III. A. (3), *infra.*
[18] Mr. Good is Managing Director, Cybersecurity, of FTI Consulting. Mr. Good has more than 25 years of experience in the cybersecurity industry, and previously served as the Head of Global Fraud Fusion and Intelligence at Citibank, was a Director in Navigant Consulting's Information Security Practice, and spent 20 years as a Special Agent with the FBI. During his time with the FBI, he served as the Deputy Assistant Director in the Cyber Division with global responsibility for cyber investigations, cyber threat intelligence, private sector engagement, and led the National Cyber Investigative Joint Task Force.
[19] Home Depot did not serve a rebuttal expert report in response to Mr. Good's expert report.

are available, the bank issuing the Payment Card (known as the "issuing bank") authorizes the transaction by sending a payment code to the merchant's computer system. (*Id.*)

Mr. Good further explained that the use of the Payment Card Data does not require the actual physical Payment Card themselves. (*Id.* at PageID 2724-2725.) He provided several examples of "card-not-present transactions," such as "online transactions, order transactions by mail or fax, or transactions over the phone," where a physical card is not necessary. (*Id.* at PageID 2724.) Thus, anyone with access to the Payment Card Data could have used this information to conduct transactions, or in the case of the hackers, to make illicit fraudulent transactions or sell the data to thieves on the dark web. This alone confirms that it was not the physical Payment Cards that were rendered unusable, but the electronic data that was compromised.

Home Depot also undercuts its coverage position when it argues for *partial* "loss of use." Partial loss of use is another way of alleging a "loss of value," which is irrefutably not covered. *See Wisc. Pharm Co v. Neb Cultures*, 876 N.W.2d 72, 83 (Wis. 2016) (loss of use requires some sort of loss in fact, not a reduction in value); *Silgan Containers Corp. v. Nat'l Union Fire Ins. Co.*, 434 Fed. Appx. 709, 710-711 (9th Cir. 2011) (third-party's business decision not to sell fruit cup containers with defective lids does not qualify as claim for "loss of use of tangible property that is not physically injured" because it was not demonstrated that the fruit inside the defective cups was completely "unusable."). Additionally, the mere use of a defective but functioning product that might fail in the future does not constitute "property damage." *F & H Const. v. ITT Hartford Ins. Co. of Midwest*, 12 Cal. Rptr. 3d 896, 905 (Cal. Ct. App. 2004).

Home Depot is misguided in relying on several decisions for the proposition that "*any* loss of use of tangible property not physically injured," whether partial or total, triggers CGL

coverage.[20]  However, and unlike this case, the cases cited by Home Depot all involve some aspect of property that sustained actual physical injury. For example, the court in *Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co.*, 142 A.3d 761, 774 (N.J. App. Div. 2016) found under New Jersey law that a CGL policy covered partial loss of use of chickens suffering from stunted growth sustained after ingesting a defective food additive. Similarly, the court in *Thomas Mach., Inc. v. Everest Nat'l Ins. Co.*, 571 F. Supp. 3d 1326 (S.D. Fla., 2021), found property damage based on loss of use under Florida law for a vehicle that was physically stolen from insured's property, with the court noting "it's easy to imagine a situation in which, for example, the thief broke into the Truck and hotwired the ignition, causing at least *some* physical damage." Likewise, the Alabama Supreme Court in  *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co.*, 851 So. 2d 466, 494-95 (Ala. 2002) determined that there was a loss of use of defective trailers manufactured by the insured that sustained cracking after carting heavy loads which they were supposedly designed to handle.

Home Depot's reliance on *Hartzell Industries v. Federal Insurance Co.*, 168 F. Supp. 2d 789 (S.D. Ohio 2001) fares no better.[21]  According to Home Depot, *Hartzell* stands for the proposition that a CGL policy covers "property damage" not only for *total* loss of use, but also *partial* loss of use.  But *Hartzell* is not even analogous to the instant matter.  In *Hartzell*, the claim arose from a power company's loss of use of tangible property (its boiler house) caused by the catastrophic failure of the insured's roof fans.  The power company alleged damages, in part, for decreased worker productivity because the boiler house became too hot during the summer months without the functioning roof fans.  According to the district court, this damage qualified as "loss

[20] *See* Home Depot's MOL at 10.
[21] *See* Home Depot's MOL  at 11.

of use of tangible property that is not physically injured," even if the loss of use of the boiler house was partial. *Id.* at 795.

Here, there are no allegations that the cardholders or even Financial Institutions found the physical Payment Cards themselves to be less useful or not useful at all. Again, Home Depot points to no evidence in the record that the Financial Institutions suffered any loss of use of the Payment Cards, whether partial or complete. To the contrary, the Financial Institutions sustained damages when they made the business decision to cancel the Payment Cards because the compromised Payment Card Data was no longer secure.

Home Depot also points to the *Target* decision as further support that a data breach can cause a total loss of use of the payment cards, so as to trigger coverage for "property damage." The *Target* Court decision, however, clearly holds that the Payment Cards became inoperable only after they were cancelled by the Issuing Banks.[22] Although the *Target* Court went on to state that payment cards no longer served their function, it cites to no evidence in the record to support this finding.

Finally, several courts have ruled that a mere breach of electronic payment card data does not amount to payment cards being useless or losing their function. For example, in *Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162 (3d Cir. 2008), hackers breached a merchant's (BJ's Wholesale) computer network and obtained credit-card data from card using customers. The card issuers replaced all existing cards resulting in unreimbursed losses for that cost. The "loss of

---

[22] The *Target* Court's reliance to the Eight Circuit Court of Appeals' decision in *Eyeblaster , Inc. v. Fed. Ins. Co.*, 613 F.3d 797 (8th Cir. 2010) was surprising. In its initial decision, the *Target* Court concluded *Eyeblaster* did not confirm coverage was available for the retail company because *Eyeblaster* involved the "'distinct' and 'broader' duty to defend," which was not at issue in the *Target* case. In reversing itself, the *Target* Court found the case not only applicable without further explanation, but now "factually analogous," which it was not. In *Eyeblaster*, the underlying claims alleged that the insured's spyware infected consumers' computers, which caused the computers to essentially became inoperable. The *Target* Court made no distinction with the payment card claims in its revised opinion, which was a flaw given the payment cards still functioned and were useable notwithstanding the data breach.

use" claim arose in the context of whether the card issuers could recover their replacement costs in tort. The Third Circuit rejected the card issuers' claim that there had been a "loss of use." In so holding, the Third Circuit concluded that the physical cards could still carry and transmit data, but that the card issuers decided they did not want their cardholders to continue using the physical cards because criminals might use the compromised data:

> The cards remained intact and useable until cancelled by [the credit union]. *The fraudulent activity simply did not render the cards useless.* The *cardholders* could continue to use [*the cards*] to make purchases after the *information* was compromised. Indeed . . . [the credit union] *deemed* the cards useless . . . because [it] was exposed to liability for unauthorized charges.

*Id.* (emphasis added); *see also Bering v. Interins. Exch. of the Auto. Club*, 2002 WL 31320598, *8 (Cal. Ct. App. Oct. 17, 2002) ("credit card information stolen [by store employee] does not constitute the destruction or loss of use of tangible property" but is "economic loss not covered by the [CGL] policies").

### 3. "Loss of Use" Coverage in CGL Policies Does Not Extend to Permanent Losses

Even if Home Depot were able to establish "property damage" to the Payment Cards, at best they establish a permanent loss that is not covered. This is consistent with the statements of the Financial Institutions themselves that alleged that the cards were rendered permanently unusable only after the Financial Institutions deliberately disabled them following the data breach.

Many courts nationally have found the term "loss of use" to relate exclusively to impermanent or temporary injury, as opposed to permanent damage. *See, e.g.*, *Advanced Network, Inc. v. Peerless Ins. Co.*, 190 Cal. App. 4th 1054, 1064 (Cal. App. 4th Dist. 2010) (theft of the money was not "loss of use" under the policy definition of property damage because although the "CGL policy does not define 'loss of use,' it is established in California that the term cannot reasonably be interpreted to include the permanent *loss* of property through conversion"); *Collin*

*v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 818, (Cal. Ct. App. 1994) ("Loss of use" of property is different from "loss" of property.); *Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc.*, 367 Wis. 2d 221, 876 N.W.2d 72 (Wisc. 2016) ("Pharmacal did not actually lose <u>use</u> of the tablets. Instead, Pharmacal permanently lost the entire value of the tablets. Accordingly, we conclude that the Netherlands policy does not provide coverage because there is no property damage due to "loss of use of tangible property that has not been physically injured."); *Drake-Williams Steel, Inc. v. Cont'l Cas. Co.*, 294 Neb. 386, 399, 883 N.W.2d 60, 69 (Neb. 2016) (insofar as the court found there was "property damage," we find merit to the Insurers' argument that costs for which insured sought reimbursement were not derived from any physical damage to the pile caps or their temporary loss of use, thus, there was no property damage and no resulting coverage under the CGL policies); *Ill. Mun. League Risk Mgmt. Ass'n v. City of Collinsville*, 100 N.E.3d 185, 2018 IL App (4th) 170015 (Ill. Ct. of App. 2018) (court found that under the plain and ordinary meaning of the language used in the coverage grants of a policy, coverage was provided under the "loss of use" prong of the property damage provision only where the damages sought relate to the impermanent nature of the injury sustained and to hold otherwise would be to decline to give effect to the words "of use" in the term "loss of use.").

In light of the above, even if Home Depot is able to establish that the Payment Cards were no longer usable after they were disabled by the Financial Institutions, at best they establish a permanent loss for which there is no coverage. There is no dispute here that the Financial Institutions' decision to cancel the Payment Cards rendered their losses permanent in nature. Home Depot, therefore, has failed to establish any "loss of use" as a matter of law.

**B. There is No Property Damage Caused By An "Occurrence"**

For coverage to be triggered within the Insuring Agreement, the alleged "property damage" must be *caused by* an "occurrence" (defined as "an accident"). (Steadfast Primary Policy, Doc 43-2 at PageID 677.) Because Home Depot has not satisfied its burden of establishing coverage for "property damage," this Court need not examine whether or not there is an "occurrence." However, even if the Payment Card Claims are found to fall within the definition of "property damage," Home Depot fails to establish the "occurrence" requirement.

Georgia law defines an "accident" in this context as "'an unexpected happening without intention or design'… 'event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes and producing an unfortunate result'… 'something that occurs unexpectedly or unintentionally.'" *Taylor Morrison Servs. v HDI-Gerling Am. Ins. Co.*, 293 Ga. 456, 460 (Ga. 2013). Numerous Georgia courts also refer to the meaning of "accident" as "an event which takes place without one's foresight or expectation or design." *See, e.g., Crook v. Ga. Farm Bureau Mut. Ins. Co.*, 428 S.E.2d 802 (Ga. App. 1993) (*quoting* O.C.G.A. § 1-3-3 (2)); *see also Cincinnati Ins. Co. v. Magnolia Estates, Inc.*, 648 S.E.2d 498, 500 (Ga. App. 2007); *Nationwide Mut. Fire Ins. Co. v. Somers*, 591 S.E.2d 430, 435 (Ga. App. 2003).

According to Home Depot, the "accident" must be viewed from the "standpoint of the insured, not the wrongdoer." [23] In support of this proposition, Home Depot erroneously cites to *Allstate Prop. & Cas. Ins. Co. v. Roberts*, 696 F. App'x 453, 454 (11th Cir. 2017), as standing for the proposition that the accident must necessarily be viewed from the "standpoint of the insured."[24]

---

[23] *See* Home Depot's MOL at 13.
[24] *Allstate* cites *Rucker v. Columbia Nat'l Ins. Co.*, 705 S.E.2d 270, 273-74 (Ga. Ct. App. 2010), which, in turn cites the *Crook* and *Cincinnati* cases, which are discussed above. However, both *Crook* and *Cincinnati* do not require the accident must be viewed from the standpoint of the insured. Neither is *Nationwide* in "accord" with *Allstate*, but rather supports the holdings in *Crook* and *Cincinnati* that the accident is simply "an event which takes place without one's foresight or expectation or design."

In fact, it is well settled under Georgia law that the proper standard for determining an accident is whether "an event . . . takes place without one's foresight or expectation or design," regardless from whose standpoint it may be viewed.

Under this construction, the cancellation and replacement of the Payment Cards was not caused by an "accident." As discussed above, the Payment Cards were functional before, during and after the Data Breach. In other words, they remained unchanged after the Data Breach and customers continued to use them for at least five (5) months until the Data Breach was discovered. It was only after the Data Breach was discovered that the Financial Institutions voluntarily cancelled the Payment Cards in order to limit perceived risk. In other words, the Financial Institutions' business decision to deactivate the Payment Cards was not an "accident" and therefore not an occurrence. *See, e.g., G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.,* 768 Fed. App'x 982 (11th Cir. 2019) (holding that there was no accident when insured sent faxes to recipients that did not consent to receiving them); *Macon Iron & Paper Stock Co. v. Transcontinental Ins. Co.*, 93 F. Supp. 2d 1370, (M.D. Ga. 1999) (holding that even if plaintiff erroneously believed it had good title to the purchased railcars, such a mistake was not an "accident" to trigger coverage because plaintiff intentionally purchased and scrapped the railcars).

Accordingly, the Financial Institutions' cancellation of the Payment Cards does not constitute "property damage" *caused by* an "occurrence" as a matter of law.

## III. THE ELECTRONIC DATA EXCLUSION BARS COVERAGE FOR THE PAYMENT CARD CLAIMS

Even if the Court determines Home Depot has satisfied it burden to establish coverage for "property damage" caused by an "occurrence," which it should not for the reasons discussed above, the Payment Card Claims are excluded by an Electronic Data Exclusion, which precludes coverage for:

### p. Electronic Data

> Damages *arising out of* the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data. (Italics added for emphasis.)

(Steadfast Primary Policy, Doc 43-2 at PageID 667.)

The exclusion defines "electronic data" as "*information, facts or programs* stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software [], drives, cells, data processing devices or any other media which are used with electronically controlled equipment." (Italics added for emphasis.) Thus, the Electronic Data Exclusion precludes coverage for damages "arising out of" the enumerated events or incidents described therein (*i.e.*, "loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data").

Home Depot claims that the Electronic Data Exclusion does not apply for two reasons: 1) Home Depot does not seek coverage for damages associated with "electronic data," such as "information, facts and programs," but rather for the costs of replacing the Payment Cards, along with lost revenue and "lost transactions"; 2) the Electronic Data Exclusion does not apply to all electronic data damage. Both arguments fail.

With respect to its first argument that the damages for which it seeks coverage are associated with tangible property, Home Depot points to the non-binding trial court decision in *Recall Total Information Management., Inc. v. Federal Insurance Co.,* No. X07CV095031734S, 2012 WL 469988 (Conn. Super. Ct. Jan. 17, 2012). Home Depot suggests that the trial court would have concluded in favor of coverage had there been "claims for actual damage to the tapes" or "the cost of the tapes." But the decision in *Recall Total* did not address an Electronic Data Exclusion and, importantly, the portion cited by Home Depot is unpersuasive *dicta*. Further, the court flatly rejected the insured's argument in *Recall Total* that the theft or loss of electronic data

tapes belonging to IBM constituted property damage, and that all consequential damages arising from the loss were covered. Instead, the court agreed with the insurers that the definition of "property damage," which included loss of use of tangible property and expressly carved out electronic data, barred the claim.

In *Camp's Grocery*, *supra.,* a case discussed above that is strikingly similar to this matter, the District Court enforced the same Electronic Data Exclusion as that contained in the Steadfast Policies as an additional basis for denying coverage. The District Court quoted the operative language of the exclusion as: "damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data," and concluded: "[T]he Credit Unions' claims for damages arising out of Camp's allegedly unlawful handling of electronic data on the credit cards are not claims for 'property damage' under the Policy and *are excluded from coverage.*" *Id.* at *22 (citations omitted and emphasis in italics).

As in *Camp's Grocery*, the damages here clearly arise out of Home Depot's alleged negligent securing of electronic data that was compromised during the Data Breach. Notably, damages barred by the Electronic Data Exclusion are not limited to any particular type of damage (*i.e.*, intangible property), but apply generally to any type of damage "arising out of" the specified events or incidents.

Under Georgia law, "when the phrase "arising out of" is found in an exclusionary clause of an insurance policy," courts "apply the 'but for' test traditionally used to determine cause-in-fact for tort liability." *Hays v. Ga. Farm Bureau Mut. Ins. Co.*, 722 S.E.2d 923 (2012); *Fireman's Fund Ins. Co. v. Univ. of Ga. Ath. Ass'n*, 654 S.E.2d 207 (2007) ("In determining the scope of an insurance provision excluding coverage for a claim "arising out of" certain events or causes, Georgia law recognizes the broad scope of this exclusion by applying the "but for" test traditionally

used to determine cause-in-fact for tort claims"). With this broad reading of "arising out of" language in mind, the losses sustained by Home Depot following the Data Breach cannot be covered under the Steadfast Policies because they arose from the "loss of" the electronic data on Home Depot's network. In other words, but for the "loss of" the electronic data from the Data Breach, the Financial Institutions would not have incurred the alleged damages associated with replacement of the Payment Cards.

This approach is consistent with the holding in *RVST Holdings, LLC v. Main Street America Assurance Co.*, 136 A.D.3d 1196 (N.Y. 3rd Dept. 2016), where hackers unlawfully obtained customers' card information from the insured's computer network and then used that information to make numerous fraudulent charges. A bank that had issued payment cards with data compromised during the breach subsequently commenced an action against the insured alleging, among other things, that the insured had negligently failed to exercise reasonable care in safeguarding the information of its cardholders, which, in turn, caused the bank to sustain damages related to its reimbursement of the fraudulent charges. *Id*. The insured then sought coverage under its insurance policy and the claim was denied based, in part, on an exclusion that specifically excludes "[d]amages arising out of the loss of . . . electronic data." *Id*. In addition to ruling the negligent handling of electronic data is not a claim for "property damage" under the policy, the New York Appellate Division, Third Department, held the claim was excluded from coverage based on the electronic data exclusion which specifically excluded "[d]amages arising out of the loss of…electronic data." *Id*. at 1198.

Home Depot's second argument that the damages do not arise out of an itemized event or incident involving electronic data also fails and, at best, is based upon an unreasonable and strained interpretation of the exclusionary language. According to Home Depot, the alleged damages – for

loss of use of the Payment Cards – do not fall within the specified incidents for: (1) "loss of"; (2) "loss of use"; (3) "damage to"; (4) "corruption of"; (5) "inability to access"; or (6) "inability to manipulate". Home Depot contends that the Data Breach did not "deprive" the Financial Institutions of their data, prevent them from accessing it, or damage the data. Rather, the Data Breach had an opposite effect because it dangerously increased access to the electronic data and allowed others to make unauthorized use of it.

Home Depot's circuitous argument is revealing because under its rationale, the increased access to electronic data similarly could not cause any "loss of use" of the Payment Cards by the consumers or Financial Institutions. In other words, the mere increase in access to the electronic Payment Card Data did not render the Payment Cards useless or less useful.

The Data Breach certainly caused a "loss of" electronic data. Under its plain and ordinary meaning[25], the term "loss" is defined to include: "the act or fact of being unable to keep or maintain something or someone" or "the harm or privation resulting from losing or being separated from someone or something." *See* Meriam-Webster, Webster.com;[26] *see also* CollinsDictionary.com ("A loss is the disadvantage you suffer when a valuable and useful person or thing leaves or is taken away.").[27] Certainly the Data Breach fits within the meaning of "loss of" because it resulted, among other things, in the failure to maintain something (*i.e.*, electronic data), a harm or privation that was caused by its disclosure, or even a disadvantage occurring by not having valuable and useful secured Payment Card Data for use in credit transactions. The decisions in *Camp's Grocery*

---

[25] "Under Georgia rules of contract interpretation, words in a contract generally bear their usual and common meaning. O.C.G.A. § 13-3-2 (2). The usual common meaning of a word may be supplied by common dictionaries." *Auto-Owners Ins. Co. v. Parks*, 278 Ga.App. 444, 446 (Ga. App. 2006) (internal citations omitted).
[26] Available at: https://www.merriam-webster.com/dictionary/loss.
[27] Available at: https://www.collinsdictionary.com/us/dictionary/english/loss.

and *RVST* are in accord with the interpretation that the Data Breach constitutes a "loss of" electronic data, so as to trigger the application of the Electronic Data Exclusion.

Similarly, the Data Breach satisfies the Electronic Data Exclusion's requirement that there be "damage to", "corruption of" and "inability to access" electronic data. The Financial Institutions alleged that hackers gained unauthorized access to Home Depot's computer network and, once inside Home Depot's computer network were able to: (1) "elevate" their credentials on the existing software of the computer network to provide greater access without triggering any alarms; and (2) install malware, designed to evade antivirus software, on the computer network which operated to siphon off Payment Card information when swiped at a Home Depot self-checkout terminal. (Consol. Complaint, Doc. 43-19 at PageID 1490-1491, ¶¶ 138-140; Opinion and Order Denying Home Depot's Motion to Dismiss, Doc. 43-21 at PageID 1628-1629; Nov. 6, 2014 Press Release, Doc. 59-4 at PageID 2706 (after access to network via unauthorized credentials, "hackers then acquired elevated rights that allowed them to navigate portions of Home Depot's network").) The malware remained on Home Depot's system undetected by Home for roughly five months, in part because malware was designed to delete its tracks on the network. (Consol. Complaint, Doc. 43-19 at PageID 1491, ¶ 141; Opinion and Order Denying Home Depot's Motion to Dismiss, Doc. 43-21 at PageID 1629; Consumer Plaintiffs' Consol. Class Action Complaint, Doc. 59-7, PageID 2942-2943, ¶ 179 ("malware designed to erase its tracks after completing designated tasks").) These allegations ██████████████ with Visa's findings following its investigation summarized for Visa's Global Compromised Account Recovery Program ("GCAR"). *See* Event Qualification Summary under the Visa GCAR Program, Doc. 58-17 at PageID 2654-2655.

In the GCAR Summary, Visa noted ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ The definition

of "damage" is a "loss or harm resulting from injury to person, property, or reputation." *See*

Meriam-Webster, Webster.com.[28] "Corruption" may be defined as: "a departure from the original

or from what is pure or correct." *See* Meriam-Webster, Webster.com.[29] By elevating the stolen

credentials on the computer network and installing malware, the hackers damaged and corrupted

Home Depot's existing software on its computer network. Moreover, the deletion of the malware's

tracks and ████████████████████████ from Home Depot's network undoubtedly resulted

in an "inability to access" that electronic data. Given the broad but-for analysis, all claims arising

out of these events must be precluded.

Accordingly, the Electronic Data Exclusion contained in the Steadfast Policies applies and

precludes Home Depot from receiving any coverage associated with the Data Breach, including

the Payment Card Claims at issue here.

## IV. HOME DEPOT'S RELIANCE ON A REVISED ELECTRONIC DATA EXCLUSION ISSUED IN 2016 IS NOT ONLY MISPLACED BUT SUPPORTS A RULING IN FAVOR OF INSURERS

---

[28] Available at: https://www.merriam-webster.com/dictionary/damage.
[29] Available at: https://www.merriam-webster.com/dictionary/corruption.

In a desperate attempt to avoid the clear application of the Electronic Data Exclusion, Home Depot misleadingly relies upon a "Policyholder Notice"[30] and revised Electronic Data Exclusion contained in Steadfast's Integrated Insurance Policy, bearing policy no. IPR 3757608-06, for policy period March 1, 2016 to March 1, 2019 ("2016 Excess Policy"). Home Depot points out the exclusion was modified to exclude "damages arising out of any access to or disclosure of any person's organization's confidential or personal information." (Citing Doc. 43-12 at 134.) According to Home Depot, this modification could have been included in the Steadfast Excess Policy at issue, but was not, and therefore suggests the policy did not exclude damages as a result of a data breach.

As an initial matter, evidence of policy changes are plainly parol evidence that should have no effect on the Court's analysis here. It is well established under Georgia law that where an insurance policy is unambiguous, parol evidence is inadmissible to vary or alter the terms of the policy. *Sapp v. State Farm Fire & Cas. Co.,* 226 Ga. App. 200, 206 (Ga. Ct. App. 1997). "[I]nsurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms." *Id.* at 201. Thus, the Court's focus must be on the policies at issue and not any post-Data Breach versions.

To the extent this Court examines extrinsic evidence, it further supports the Insurers' arguments that there is no coverage afforded for the Payment Card Claims. Home Depot omits the portion of the Policyholder Notice that reads: "This is a reinforcement of coverage intent." *Id.* In other words, the additional language contained in the revised Electronic Data Exclusion was not meant to materially modify the scope of CGL coverage, but rather reinforce what had already been

---

[30] "Policyholder Notice" refers to the "Policyholder Notice – General Liability Access Or Disclosure Of Confidential Or Personal Information Exclusions" contained within Steadfast Commercial Insurance Policy, bearing policy no GLO- 4887714-06, for policy period March 1, 2016 to March 1, 2017, but the revised Electronic Data Exclusion discussed above is not contained in this policy. (*See* Doc. 43-12 at 134.)

carved out or excluded in the policy language (*i.e.*, cyber-related risks, such as data breaches, which are not covered by CGL policies).

This coverage intent to exclude cyber-related risks was prominently disclosed by the Insurance Services Office, Inc. (known as "ISO"), upon which Steadfast's CGL coverage forms are modeled.[31]  In numerous ISO filings made just months before Home Depot, through its broker, procured the Steadfast Policies in 2014,  ISO submitted "impact" explanations to state regulators with regard to several forms, including the revised Electronic Data Exclusion, which stated, in pertinent part:

> With respect to … property damage arising out of access or disclosure of confidential or personal information, these changes are a ***reinforcement of coverage intent***. As discussed above, damages related to data breaches, and certain data-related liability, are not intended to be covered under the abovementioned [CGL] coverage part. These types of damages may be more appropriately covered under certain stand-alone policies including, for instance, an information security protection policy or a cyber liability policy.

(Stegall Report, Doc. 59-6 at PageID 2744-2745, 2795-2798, 2832-2834.) ISO's filings put policyholders on notice that CGL policies were not designed to provide risk transfer for cyber-related risks.

Further, the record is clear that Home Depot had a separate insurance program intended to cover cyber-attacks and resulting losses (*i.e.*, the Cyber Tower), which did in fact pay its liability limits of $100M for the Data Breach.  That Cyber Tower was the result of a cyber insurance market that had evolved over time in reaction to evolving cyber risks. (Stegall Report, Doc. 59-6 at PageID 2745.)[32]  As a sophisticated policyholder with a highly complex insurance program (*see* Email and

---

[31] ISO is an organization that develops standard policy forms, including CGL forms, and files those forms with state regulators for approval.  *See* Irimi.com, available at: https://www.irmi.com/term/insurance-definitions/insurance-services-office-inc#:~:text=(ISO)-,Definition,Subscribers%20Only%3A%20CPI%20II.R.  Although the Steadfast CGL forms are proprietary, they include copyrighted materials of ISO with its permission.

[32] Home Depot did not serve a rebuttal report to Mr. Stegall's opinions.

Renewal Strategy Plan, Doc. 58-16), Home Depot should have understood the scope and differences between the coverage afforded in the Cyber and CGL Towers. If Home Depot believed cyber-related risks were covered under the CGL Tower, why would it endeavor to procure a Cyber Tower with $100 M in liability limits? The fact of the matter is that there would be no coverage dispute here had the Cyber Tower not exhausted.

Accordingly, regardless of what subsequent policies may have said, the language and intent of the Steadfast Policies that Home Depot seeks coverage under here is clear: the Electronic Data Exclusion precludes coverage for any damage "arising out of" the "loss of", "damage to" and "corruption of" electronic data, which includes the Payment Card Claims.

## V. HOME DEPOT'S BREACH OF CONTRACT CLAIMS SHOULD BE LIMITED TO WHETHER THE INSURERS HAVE A DUTY TO INDEMNIFY

Contrary to Home Depot's arguments, this is not a case about the duty to defend or duty to reimburse defense costs.[33] Rather, this dispute solely involves whether the Insurers have a duty to indemnify Home Depot for the Payment Card Claims, specifically the settlement payments made by Home Depot to the Financial Institutions. The litigation in the FICA has terminated with the settlement of the Payment Card Claims. Home Depot is not seeking, and cannot seek, any current or future defense costs with respect to the FICA or Payment Card Claims.

Home Depot also concedes it bears the financial responsibility for the first $25M for covered claims.[34] The Steadfast Excess Policy sits above $25M of underlying Home Depot self-insurance as follows: $16M in SIRs and a $9M deductible amount that matches the liability limit

---

[33] *See* Home Depot's MOL at 18-20.
[34] *See* Home Depot's MOL at 4; *see also* Decl. of M. Ward in Supp. of Plfts.' Mot. for P. Summ. J. (Doc. No. 43-1) ¶¶ 3, 6; Complaint ¶ 60 ("Home Depot bore the cost of the first $25[M] of this loss pursuant to the terms of the Steadfast Policies and self-insured retentions."); ¶ 61 ("Home Depot now demands the full amount of the limits on the Steadfast Excess Policy and Great American Umbrella Policy in connection with this covered loss, in excess of $25[M].").

in the Steadfast Primary Policy. With respect to the SIRs, Home Depot is financially responsible for all defense and indemnity costs for covered claims. With respect to the $9M matching deductible amount, Home Depot is financially responsible for the liability limit and any "allocated loss adjustment expense," which includes costs for attorneys' fees and court expenses.[35] The "allocated loss adjustment expense" does not erode the $9M deductible amount. Thus, the "allocated loss adjustment expense" applies in addition to the $9M deductible amount for indemnity costs.

To date, Home Depot has made no demand or presented any evidence that the defense costs incurred in the FICA exceed the $25M underlying layers of SIRs and the deductible amount. Nor is there any evidence that Home Depot has suffered any damages as a result of an alleged breach on the duty to defend by Steadfast. Rather, the record is bare of any evidence that Steadfast owes a single penny for defense costs under the Steadfast Policies.

To establish a duty to indemnify, Home Depot bears the initial burden of establishing that the Payment Card Claims fall squarely within the four corners of the Steadfast Primary Policy's Insuring Agreement. For the reasons discussed above, Home Depot cannot sustain its burden. *See, e.g., Int'l Ins. Co. of Hannover, S.E. v. Morrowood Townhouses, LLC*, 2015 WL 11455589, at *4 (N.D. Ga. Nov. 4, 2015) ("The duty to indemnify is triggered only when the insured is determined to be liable for damages within the policy's coverage.") (citation and internal quotation marks omitted); *Allstate Ins. Co. v. Airport Mini Mall, LLC*, 265 F. Supp. 3d 1356, 1366 (N.D. Ga. 2017) ("The duty to indemnify is determined by the true facts as they are established in the underlying action.") (citation and internal quotation marks omitted).[36]

---

[35] *See* Deductible Endorsement, Option 3 of Allocated Loss Adjustment Expense Selection Schedule.
[36] Home Depot's citation to *Southern Guar. Ins. Co. v. Dowse*, 605 S.E.2d 27, 29 (Ga. 2004) for the proposition that Insurers' are estopped from contesting liability is misplaced. (*See* Home Depot's MOL at 20.) The Georgia Supreme Court's ruling was limited to an insurer's ability to contest a settlement made in good faith and without its consent

The parties' motions for summary judgment should be decided strictly under this duty to indemnify standard, not the broader duty to defend standard. To argue otherwise is an attempt to obfuscate the actual issues before this Court. Home Depot, however, has fallen short of meeting its burden of establishing coverage.

## VI.    CONCLUSION

Based upon the foregoing, Steadfast respectfully submits that this Court: (1) grant its Cross-Motion for Summary Judgment against Home Depot; (2) deny Home Depot's Motion for Partial Summary Judgment Against Steadfast; and (3) declare that Steadfast has no obligation to defend or indemnify Home Depot for the Payment Card Claims; and (4) granting such other relief to Steadfast as this Court deems just and proper.

Dated: October 13, 2022

Respectfully Submitted,

  /s/ Kevin M. Young
Kevin M. Young (0029715)
Jennifer L. Mesko (0087897)
TUCKER ELLIS LLP
950 Main Ave., Suite 1100
Cleveland, Ohio 44113-7213
Telephone: (216) 592-5000
kevin.young@tuckerellis.com
jennifer.mesko@tuckerellis.com

Kevin T. Coughlin (*pro hac vice*)
Suzanne C. Midlige (*pro hac vice*)
Steven D. Cantarutti (*pro hac vice*)
Patrick A. Florentino (*pro hac vice*)
COUGHLIN MIDLIGE
& GARLAND LLP
350 Mount Kemble Ave.
P.O. Box. 1917
Morristown, New Jersey 07962

---

where it refused to defend under a reservation of rights. The Court went on to hold that the "insurer does not waive its right to contest the insured's assertion that the insurance policy provides coverage for the underlying claim."

Telephone: (973) 267-0058

kcoughlin@cmg.law
smidlige@cmg.law
scantarutti@cmg.law
pflorentino@cmg.law

*Counsel for Defendant*
*Steadfast Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, the foregoing Defendant Steadfast Insurance Company's Memorandum of Law in Support of Its Cross-Motion for Summary Judgment Against Plaintiffs and in Opposition to Plaintiff's Motion for Partial Summary Judgment, was filed using the CM/ECF system, which will automatically provide notice to all counsel of record by electronic means.

Dated: October 13, 2022                    Respectfully Submitted,

                                           _/s/ Kevin M. Young_____
                                           Kevin M. Young (0029715)
                                           *One of the Attorneys for Defendant*
                                           *Steadfast Insurance Company*